NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0279n.06
Filed: April 16, 2007

Nos. 05-5622, 05-5625, 05-5825, 05-5826

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| WILLIEANN D. MADISON, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*, | ) | |
| | ) | |
| JOHN E. MADISON, | ) | |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE:   COOK and McKEAGUE, Circuit Judges, and EDGAR, District Judge.[*]

**McKEAGUE, Circuit Judge.**  Co-defendants WillieAnn and John Madison, husband and wife, appeal their convictions and sentences for numerous counts of tax evasion, money laundering, conversion of property, and fraud.  For the following reasons, the convictions are affirmed, Mr. Madison's sentence is affirmed, and Mrs. Madison's sentence is reversed and remanded.

## I.  BACKGROUND

---

[*]Honorable R. Allan Edgar, Senior United States District Judge for the Eastern District of Tennessee, sitting by designation.

Between 1996 and 1999, Mr. Madison worked as a certified public accountant; was self-employed as a minister; worked as the Director of the Little People's Child Development Center ("Little People's"), a day care; and participated with Mrs. Madison in a number of real estate and other financial ventures. Mrs. Madison's principal employment from 1996-1999 was as the executive director for Cherokee Children and Family Services, a non-profit organization that "brokered" federal financial assistance for the day care needs of low-income families.[1]

The defendants treated their personal property and the property of the businesses for which they worked as substantially interchangeable. In 1999, Mrs. Madison purchased at auction the property at 2755, 2759, 2763, 2771, and 2768 Colony Park Drive in Memphis, Tennessee, for a total price of $1,083,500. She paid $98,500 down on March 5, 1999, the day of the auction. In February of 1999, Mrs. Madison directed Cherokee to write her a check for a $141,000 retroactive "rent increase due"[2] on the office space she rented to Cherokee. Mrs. Madison used these funds to pay the down payment on the Colony Park property. On March 22, 1999, Mrs. Madison secured an *additional* retroactive increase in the rent, in the amount of $437,000. She used this money to pay part of the balance due on Colony Park. On April 1, 1999, Cherokee wrote a check for $250,000 to "Fund Management." Mrs. Madison endorsed the check as "Fund Management" and paid these funds also to the sellers of the Colony Park properties. A total of $834,000 of the purchase money for the Colony Park properties came from Cherokee.

---

[1] Another non-profit, Cherokee Children Nutrition Program, was run under the umbrella of Cherokee Children and Family Services; the organizations collectively are referred to as "Cherokee."

[2] The monthly rent at that time was $6000.

In 1998, both defendants, a Cherokee employee, and nine of Mrs. Madison's relatives took a pleasure trip to London, for which Cherokee paid substantially all of the expenses. In May of 1999, Cherokee paid $2,554 for travel expenses for approximately thirty members of Mrs. Madison's family to attend the college graduation of Mrs. Madison's daughter. In 1999, Cherokee and Little People's also paid over $25,000 for seventeen members of Mrs. Madison's family to go on a Caribbean cruise. Cherokee also paid for a weekly cleaning service to clean not only its offices, but also the homes of Mrs. Madison and her mother.

In addition to misappropriating almost $1 million in Cherokee funds, Mr. and Mrs. Madison engaged in a systematic deception of both the IRS and the Tennessee Department of Human Services (the "TDHS"), the agency for which Cherokee brokered day care subsidies for the poor. Between 1996 and 1998, Cherokee paid Mrs. Madison $72,000 per year in rent for the Cherry Center property. In 1999, Cherokee paid Mrs. Madison $241,530 in rent for the Cherry Center property, in addition to the $437,000 "retroactive rent increase." By contrast, defendants' tax returns for 1996, 1997, and 1998 reflected $36,000 in rental income for the Cherry Center property; in 1999, the defendants reported $72,000 in rental income for the property.

Mr. Madison was paid at least $108,000 per year under contracts to perform accounting work for Cherokee Family and Children Services, Cherokee Children Nutrition Program, and Creative Learning Center, Inc.[3] However, on his tax returns, he reported $41,845 in total accounting income

---

[3]Mr. Madison testified that he did *not* also have a $3000 per month accounting contract with Little People's; the prosecution impeached this testimony with a prior sworn statement that he *did* have such a contract. J.A. at 2865-68. Counting this contract, he would have received $144,000 annually in accounting income.

for 1996; $27,295 for 1997; $28,576 for 1998; and $40,000 for 1999. The defendants also omitted from their income tax returns $22,287.88 in 1997 and $6106.86 in 1998 in net profits for the A.C. Jackson day care, which they ran. In addition, in 1999, Mrs. Madison sold a parcel of real estate and provided financing; she failed to report the interest income from that mortgage. Mrs. Madison also failed to report as income Cherokee's payment of her personal expenses for such items as clothing, travel, utility payments and cleaning services for her residence, and a cruise.

On the Form 990 returns Mr. Madison prepared for Cherokee in 1996, 1997, 1998, and 1999, he answered "no" to the question, "During the year, has the organization, either directly or indirectly, engaged in any of the following acts of any of its trustees, directors, officers, creators, key employees or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary: . . . a sale, exchange, or leasing of property?" In fact, of course, Cherokee leased its offices from its executive director, Mrs. Madison.

One of the leases between Cherokee and Mrs. Madison for the Cherry Center property listed the size of the Cherry Center property as 20,000 square feet, a figure provided by Mrs. Madison. This figure also appeared on the copy of the Cherry Center lease provided to TDHS as a verification of the reimbursable costs in Cherokee's 2000 budget. In fact, the Cherry Center property contained 9,648 square feet, which Mrs. Madison knew. Finally, as part of a required disclosure regarding whether a broker of subsidized child care "would be placing children in child care providers that they had some sort of relationship with," Mrs. Madison wrote a letter to the TDHS, stating that she "owns properties where two nonprofit day care centers are operated in the Memphis area, but is not

involved in the day-to-day operations of the centers." Transcript 4/20/04 at 176, 178. In fact, Mrs. Madison was in charge of the operations of Little People's.

Following a fifteen-day jury trial, Mrs. Madison was convicted on May 12, 2004, of four counts of Attempt to Evade or Defeat Tax in violation of 26 U.S.C. § 7201; one count of False Statements on Tax Documents Under Penalty of Perjury in violation of 26 U.S.C. § 7206(1); two counts of False Statements on a matter within the jurisdiction of the federal government in violation of 18 U.S.C. § 1001; four counts of False or Fraudulent Claims against a department of the United States in violation of 18 U.S.C. § 287; five counts of Theft from Programs Receiving Federal Funds in violation of 18 U.S.C. § 666(a)(1); and five counts of Engaging in Monetary Transactions Involving Property Derived from Unlawful Activity in violation of 18 U.S.C. § 1957. Mr. Madison, who was tried jointly with Mrs. Madison, was convicted of four counts of Attempt to Evade or Defeat Tax in violation of 26 U.S.C. § 7201, and four counts of Aiding the Preparation of Tax Documents Containing False or Fraudulent Statements in violation of 26 U.S.C. § 7206(2).

Mrs. Madison was sentenced to twenty-one months' incarceration on each count, to run concurrently, and thereafter to three years of supervised release. She was also ordered to pay restitution in the amount of $751,832.04, and to forfeit over $1.1 million and the two Colony Park properties she had not yet sold, or substitute property of equivalent value. Mr. Madison was sentenced to ten months' imprisonment on each count, to run concurrently, and thereafter to three years of supervised release, to include ten months' home confinement. Mr. Madison was ordered to pay $564,832.04 in restitution, for which he was jointly and severally liable with Mrs. Madison;

she bore sole responsibility for the remaining $187,000. Both defendants now appeal their

convictions and sentences.

## II. LAWFULNESS OF SEARCH

On April 1, 2001, Cherokee's board terminated the lease of the Colony Park premises

between itself and the defendants. On April 12, the court-appointed receiver for Cherokee's assets

visited the Colony Park property. On April 17, with the receiver's free consent, an FBI agent

investigating the activities of the defendants examined the contents of 2771 Colony Park Drive.

Later that day, the FBI Agent served the receiver with a subpoena from the Grand Jury, which

required the receiver to turn over certain records at the Colony Park office.

Mrs. Madison contends on appeal that the search of Cherokee's office space at 2771 Colony

Park, Memphis, Tennessee, was unlawful and that all evidence obtained as a result of that search

should have been suppressed by the district court.[4] "In reviewing a denial of a motion to suppress,

we review the district court's legal conclusions *de novo* and its findings of fact for clear error."

*United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (citing *United States v. Harris*, 192 F.3d

580, 584 (6th Cir. 1999)).

Police may lawfully search a location if they receive valid consent. *United States v. Morgan*,

435 F.3d 660, 663 (6th Cir. 2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

This consent may be given by any person "'who possesse[s] common authority over or other

---

[4]Contrary to the government's argument, whether Mrs. Madison has "standing" to contest the seizure of documents at Colony Park is not the proper inquiry for this court. Rather, "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)).

sufficient relationship to the premises or effects sought to be inspected.'" *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)). Common authority is

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Waller*, 426 F.3d 838, 845 (6th Cir. 2005) (quoting *Matlock*, 415 U.S. at 171 n.7). Common authority is not a function of actual ownership rights in the premises. *Id.* (quoting *Matlock*, 415 U.S. at 171 n.7). In fact, an actual owner does *not* have authority to give consent if the premises searched are occupied by his tenant.[5] *Wilhelm v. Boggs*, 290 F.3d 822, 826 (6th Cir. 2002).

The district court reasonably found based on the evidence that "at least one employee, Mrs. Weathers, continued to work for Cherokee Children from the Colony Park location after April 1." Report and Recommendation on Motion to Suppress ("R.R.") at 8. Despite the termination of the lease on April 1, when the receiver took control of 2771 Colony Park Drive on April 12, Cherokee was still engaging in "use of the property" and had "common authority over" the premises. Thus, Cherokee itself had authority to consent to the search. The appointing court here ordered the receiver to "[t]ake exclusive custody, control and possession of all . . . effects, books and records of account and other papers and property or interests owned or held by the [Cherokee Corporations] . . . with full power to . . . receive and take possession of such receivership properties." R.R. at 9. Thus, the

---

[5]Nor need an occupant be a party to a lease agreement in order to have authority to consent. *See, e.g.*, *United States v. Clutter*, 914 F.2d 775, 778 (6th Cir. 1990) (a twelve- and a fourteen-year-old boy had common authority to consent to a search of their parents' home where they were "routinely left in exclusive control of the house" and their parents' "possession of large quantities of marijuana was . . . open and patently non-exclusive"). Thus, the fact that Cherokee's board terminated the lease on April 1 and the search and subsequent seizure occurred on April 17 is not dispositive of whether Cherokee had authority to consent to the search.

receiver exercised Cherokee's own authority, and had the authority to consent to the FBI agent's search of 2771 Colony Park Drive.[6]  *See Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 626 (6th Cir. 2003).

Mrs. Madison additionally argues that the seizure was invalid because the Grand Jury subpoena was facially defective.  However, it is not necessary for the panel to decide this question, because the receiver voluntarily consented to the FBI agent's seizure of the materials.  The district court found that the receiver "did not ask for a subpoena; he only asked that [the FBI agent] provide him with an inventory of the documents taken," and that the receiver said, prior to being served with a subpoena, that the FBI agent "was free to look around the building and to collect whatever files he needed."  R.R. at 26-27. Consent to a search may be voluntary even if the person giving the consent has already been served with a subpoena for the items to be seized, to say nothing of the case here, where the receiver consented when he had not yet been served with a subpoena.  *See United States v. Susskind*, 965 F.2d 80, 87 (6th Cir. 1992) (holding that the defendant's consent to search was voluntary although he had been served with a subpoena), *vacated*, 975 F.2d 1206 (6th Cir. 1992), *analysis adopted*, 4 F.3d 1400, 1401 (6th Cir. 1993) (en banc)); *see also United States v.*

---

[6]The FBI agent also seized files in a locked closet at 2771 Colony Park Drive.  Because the receiver stood in the shoes of Cherokee, he could consent to the search of a locked closet to which Cherokee had access.  The fact that Cherokee as an entity had access to the closet is demonstrated by the fact that Cherokee employees other than Mrs. Madison had keys to the closet.  Moreover, a Cherokee employee testified that Mrs. Madison had come to 2771 Colony Park and removed her personal possessions before April 17.

Mrs. Madison also argues that even if the receiver had authority to consent to a search of the Colony Park premises, he did not have authority to consent to a search of her office, which she sometimes, but not always, kept locked.  However, she never so much as alleges what, if any, incriminating documents were seized from her office, nor contends that she was prejudiced by the admission of any particular document.  *See Chambers v. Maroney*, 399 U.S. 42, 53 (1970) (holding that the admission of evidence obtained as a result of an illegal search and seizure is subject to a harmless-error analysis).

*Iglesias*, 991 F.2d 1519, 1522 (9th Cir. 1989) (the fact that an officer threatened the "issuance of a grand jury subpoena" held not "sufficient to render . . . consent [to search] involuntary").

The district court did not clearly err in finding the consent to be voluntary. Because a person lawfully in control of the premises consented to the search and to the removal of documents, Mrs. Madison's motion to suppress was properly denied.

### III. SUFFICIENCY OF THE INDICTMENT

"The sufficiency of an indictment is reviewed *de novo*." *United States v. Gibson*, 409 F.3d 325, 331 (6th Cir. 2005). The statute prohibiting theft from a program receiving federal funds contains a jurisdictional limit, making it applicable only if the defendant steals from or defrauds an organization that "receives, in any one-year period, benefits in excess of $10,000 under a Federal program involving . . . [a] form of Federal assistance." 18 U.S.C. § 666(b). Mrs. Madison argues that the indictment was insufficient because instead of alleging that Cherokee received *benefits* in excess of $10,000, the indictment alleged that Cherokee received *federal assistance* in that amount.

"[A]n indictment is only sufficient if it (1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy." *Valentine v. Konteh*, 395 F.3d 626, 631 (6th Cir. 2005). Mrs. Madison has not made a colorable argument that the indictment here fails so much as one of these requirements. The indictment was not insufficient, but gave Mrs. Madison adequate notice of the charged offense – namely, theft from an organization receiving federal benefits under 18 U.S.C. § 666.

### IV. ADMISSIBILITY OF LAY OPINION TESTIMONY

A district court's decision to permit a witness offering opinion testimony to testify as a lay witness is reviewed for abuse of discretion. *JGR, Inc., v. Thomasville Furniture Indus.*, 370 F.3d 519, 524 (6th Cir. 2004). Mrs. Madison argues that the trial court improperly permitted FBI analyst Joe Ford to offer opinion testimony when he had not been offered as an expert witness. The Rules of Evidence permit a non-expert witness to testify "in the form of opinions or inferences" if these "are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Mrs. Madison complains that Ford offered the conclusion that she would not have been able to purchase the Colony Park property without the Cherokee funds. She cites *JGR*, in which this court adopted the reasoning of the Fifth Circuit in *Dijo, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679 (5th Cir. 2003). In *Dijo*, a "financial consultant," who was not offered as an expert, testified regarding the value to the plaintiff of a lost contract. 351 F.3d at 685, 686. The Fifth Circuit held that admitting this testimony was an abuse of discretion, because the witness's "'opinion . . . was based on preliminary income figures and other information that he had received from [the plaintiff's founder],' and his 'appraisal . . . was [not] based upon his own independent knowledge or observations.'" *JGR*, 370 F.3d at 525 (citations omitted) (quoting *Dijo*, 351 F.3d 685-87). However, *Dijo* is distinguishable from this case. In *Dijo*, the witness offered an appraisal of the economic value of a lost contract, which necessary is a matter of opinion. Here, Ford merely examined the records of transactions involving Mrs. Madison's and Cherokee's accounts and stated the origin and the destination of funds.

- 10 -

The Eleventh Circuit recently addressed a similar situation in *United States v. Hamaker*, 455 F.3d 1316 (11th Cir. 2006). In that case, a company was billed not only for its own construction work, but also for construction performed on the personal property of its CEO. *Id.* at 1319. The government offered testimony to show that the company paid for the CEO's private projects. *Id.* at 1331. The Eleventh Circuit held,

> Contrary to Appellants' contention, the government was not required to certify Odom as an expert witness . . . . To prepare for his testimony, Odom simply added and subtracted numbers from a long catalogue of MCC records, and then compared those numbers in a straightforward fashion. As Odom himself explained at trial, while his expertise and the use of computer software may have made him more efficient at reviewing [the company's] records, his review itself was within the capacity of any reasonable lay person.

*Id.* at 1331-32. We find the Eleventh Circuit's reasoning to be persuasive, and applicable to Ford's testimony. His status as a financial analyst may, like the computer expertise of the witness in *Hamaker*, have facilitated his review of accounting records. However, his conclusion that Mrs. Madison would not have been able to make the down payment on the Colony Park property without funds converted from Cherokee is a matter of arithmetic "within the capacity of any reasonable lay person." *See also Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("A mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701."). The district court thus did not abuse its discretion in permitting Ford's testimony.

## V. SUFFICIENCY OF THE EVIDENCE

"The standard of review for [a] challenge as to the sufficiency of the evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Davis*, 473 F.3d 680, 681 (6th Cir. 2007) (quoting *United States v. Woods*, 877 F.2d 477, 479 (6th Cir. 1989)). Mrs. Madison first contends that the government failed to prove attempted tax evasion under 26 U.S.C. § 7201, because there was not sufficient evidence of willfulness or of the commission of an affirmative act.

"A jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct"; that is, willfulness can be proved by circumstantial evidence. *Ratzlaf v. United States*, 510 U.S. 135, 149 n.19 (1994); *see also United States v. Bank of New England, N.A.*, 821 F.2d 844, 854 (2d Cir. 1987). The fact that a defendant filed a false tax return, without more, may constitute an affirmative act. *United States v. Garavaglia*, 566 F.2d 1056, 1058 (6th Cir. 1977). If the return was prepared by someone other than the defendant, more is required. In *United States v. Cor-Bon Custom Bullet Co.*, 287 F.3d 576 (6th Cir. 2002), this court held where a third party prepares a return, an affirmative act of evasion

> includes, but is not limited to, "conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income . . . [or] any conduct, the likely effect of which would be to mislead or to conceal."

287 F.3d at 579 (quoting *Spies v. United States*, 317 U.S. 492, 499 (1943)).

In this case, Mrs. Madison was convicted of evading tax in 1996, 1997, 1998, and 1999. Among the inaccuracies in reporting was her listing of only half the rent received for the Cherry Center property through 1998, and approximately 10% of the rent in 1999. There were four different leases between Mrs. Madison and Cherokee for the Cherry Center property covering overlapping

time periods; the four leases showed three different monthly rent rates between them, none of which was the $3000 per month Mrs. Madison reported from 1996 to 1998.

Thus, Mrs. Madison was keeping a triple or quadruple set of records, which was an affirmative act concealing her real income. Moreover, from Mrs. Madison's conduct as a whole, including her extensive misappropriation of Cherokee funds for her own purposes and elaborate concealment of her activities from Cherokee, its auditors, and the government, the jury could certainly conclude that her under-reporting of income was willfully calculated to enhance her own holdings and defraud the federal government.

Mr. Madison likewise argues that there was not sufficient evidence to convict him of attempted tax evasion in 1996, 1997, 1998, and 1999. In addition to the rental income from the Cherry Center property discussed above, Mr. Madison failed to report his accounting income from Cherokee Children and Nutrition, Creative Learning Center, and Little People's. In 1996, 1997, and 1998, he prepared the defendants' joint returns. As stated above, this constitutes an affirmative act. In 1999, the defendants' return was prepared by a law firm. However, Mr. Madison engaged in affirmative acts of evasion in that year as well. Although he prepared 1099 forms indicating the income of other Cherokee independent contractors, he failed to prepare any 1099 for himself as Cherokee's accountant. This failure entails "concealment of assets or covering up sources of income" and certainly as "conduct, the likely effect of which would be to mislead or to conceal." Thus, Mr. Madison engaged in affirmative acts to evade the payment of income taxes.

Mrs. Madison also contests her conviction for Making False Statements on Tax Documents in violation of 26 U.S.C. § 7206(1). This charge was based on the fact that she signed Cherokee's

form 990 for 1999, which stated that Cherokee was not involved in any related-party real estate transactions, although Mrs. Madison knew that she was the lessor of Cherokee's office space. Mrs. Madison argues that the false statement was not material. "A matter is 'material' if it has a natural tendency to influence, or is capable of influencing or affecting, the ability of the IRS to audit or verify the accuracy of a tax return." *See United States v. Tarwater*, 308 F.3d 494, 505 (6th Cir. 2002) (citing *Neder v. United States*, 527 U.S. 1, 16 (1999)). A revenue agent for the IRS Tax Exempted Government Entities Division testified that if an entity reported that it engaged in related-party transactions, the IRS would ask seek documentation of such transactions during the audit interview, but would not do so if no such transactions were reported. Thus, a false answer to the question is capable of affecting and actually affects the ability of the IRS to perform an audit.

Mr. Madison contends that his conviction for aiding in the preparation of false tax documents in violation of 26 U.S.C. § 7206(2) was also invalid. The charges were based on his preparation of Cherokee's form 990 submissions for 1996-1999, which denied that Cherokee engaged in related-party transactions. He argues that because Mrs. Madison was acquitted of making false statements on tax documents for 1996, 1997, and 1998, he should not have been convicted for aiding in making false statements for those years. However, "'there is no . . . bar to prosecuting someone as an aider and abettor after an alleged de facto principal is acquitted.'" *United States v. Stewart*, 306 F.3d 295, 307 (6th Cir. 2002) (quoting *United States v. Yost*, 24 F.3d 99 (10th Cir. 1994)).

Mrs. Madison also contests her conviction for Making False Statements on a Matter within the Jurisdiction of the Federal Government in violation of 18 U.S.C. § 1001. She argues that her false statement regarding the square footage of the Cherry Center property was not willful, *see*

- 14 -

*United States v. Rogers*, 117 F.3d 466, 470 (6th Cir. 1997) (quoting *United States v. Steele*, 933 F.2d 1313, 1318-19 (6th Cir. 1991) (en banc)), because she did not know that the number she gave was false, and that her statement that she was "not involved in the day-to-day operations" of the Little People's day care centers was actually true.

The word "willfully" has the same meaning in 26 U.S.C. § 7206(1), (2) as it does in § 7201. *United States v. Bishop*, 412 U.S. 346, 359-60 (1973). Thus, it seems reasonable to conclude that willfulness for purposes of § 7206(1) can be "established by drawing reasonable inferences from the available facts," as it can for purposes of § 7201. *See Bank of New England*, 821 F.2d at 854. Here, the government presented evidence that the square footage of the Cherry Center property had been discussed with Mrs. Madison. The evidence also showed that she was knowledgeable regarding real property transactions. This evidence, in conjunction with Mrs. Madison's broad practice of dishonest reporting and false rent charges, permitted a rational trier of fact to find that she was aware of the real square footage of the property, and misstated it deliberately.

Mrs. Madison's argument that the jury was required to find that her claim not to be involved in the day-to-day operations of Little People's was truthful is without merit. The government presented evidence that she made hiring decisions, set salaries and the fees clients were charged, approved time cards, and authorized purchases. The director of Little People's discussed the day care's business with Mrs. Madison two or three times a week. It was the province of the jury to determine whether the statement in the letter was true, and given the evidence they were eminently rational in finding it to be false.

Mrs. Madison argues that her conviction for Theft from a Program Receiving Federal Benefits in violation of 18 U.S.C. § 666(a)(1) was based on insufficient evidence because the government did not establish that she committed the offense willfully. The statute applies to one who "without authority *knowingly* converts" or "*intentionally* misapplies" the funds of an organization receiving federal benefits. 18 U.S.C. § 666(a)(1)(A) (emphasis added). Mrs. Madison's argument is, in essence, that her conversion of Cherokee's property was not knowing or intentional. This argument is not even facially meritorious. To violate the statute, she needed only to misapply intentionally funds which she knew not to be hers. As discussed above, the government presented evidence of her elaborate scheme to convert Cherokee's funds to pay for the Colony Park properties; her habitual use of the Cherokee American Express card for her personal expenses; and her efforts to conceal her conversion of Cherokee funds. The jury could rationally have concluded based on this evidence that Mrs. Madison knew Cherokee's property was not hers and that she intentionally converted it to her use despite this fact. In addition, because there was sufficient evidence to convict Mrs. Madison of theft under § 666(a)(1)(A), she was also properly convicted of Engaging in Monetary Transactions Involving Property Derived from Unlawful Activity in violation of 18 U.S.C. § 1957.

Finally, Mrs. Madison claims that the evidence was insufficient to convict her of Making False Claims Against a Department of the United States in violation of 18 U.S.C. § 287. However, she provides no hint as to what about the evidence was insufficient. Therefore, the panel need not address this assignment of error. *See United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("It is not this court's responsibility to research and construct the parties' arguments."); *see also*

*Figueroa-Rubio v. INS*, 108 F.3d 110, 112 (6th Cir. 1997). In sum, there was sufficient evidence for a rational trier of fact to conclude that both Mr. and Mrs. Madison were guilty of every offense of which they were convicted.

## VI. CONSTITUTIONALITY OF 18 U.S.C. § 666 AS APPLIED

A "challenge to the constitutionality of the application of § 666 involves questions of law," and is therefore reviewed *de novo*. *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001). As a jurisdictional requirement for conviction under § 666, "the [victim] organization, government, or agency [must] receive[], in any one year period, benefits in excess of $10,000 under a Federal program." 18 U.S.C. § 666(b); *see also Suarez*, 263 F.3d at 484. Mrs. Madison argues that § 666 was unconstitutional as applied to her because she did not convert Cherokee's federal benefits themselves, but rather the fee the federal government paid Cherokee to administer those benefits. Her argument has been rejected by this court. "A defendant under 18 U.S.C. § 666 need not be shown to have actually stolen any of the federal funds given to the 'federal recipient' or even that his malfeasance affected those federal funds." *Suarez*, 263 F.3d at 484 (citing *United States v. Salinas*, 522 U.S. 52, 55-58 (1997)).

To determine whether the conversion of the assets of a funded program falls under § 666, the Supreme Court in *Fischer v. United States*, 529 U.S. 667 (2000),

> recommend[ed] a fact-based inquiry into the "program's structure, operation, and purpose" to determine whether the criminal conduct posed a threat to the integrity of *the federal program*. If it does pose such a threat (as was found with defendant Fischer's conduct), then the statute may be applied constitutionally, regardless of whether the federal funds are affected directly.

*Suarez*, 263 F.3d at 486 (quoting *Fischer*, 529 U.S. at 681-82) (citation omitted) (emphasis added).

Cherokee's purpose was to disburse federal and state funds appropriated to help low-income families

pay for day care, and the evidence showed that Mrs. Madison's continual self-dealing endangered

Cherokee's non-profit status. The loss of that status, and the resulting significant tax liability, would

certainly have threatened the integrity of Cherokee's program. Therefore, under the standard in

*Suarez* and *Fischer*, § 666 was constitutional as applied to Mrs. Madison.

## VII. CONSTITUTIONALITY OF FACTFINDING BY SENTENCING JUDGE

Defendants assert that their sentences violated the Sixth Amendment as interpreted in *United*

*States v. Booker*, 543 U.S. 220 (2005), because their guidelines ranges were based on facts found by

the judge rather than the jury. In fact, *Booker* explained that the remedy for the Sixth Amendment

violation inherent in the guidelines sentencing scheme was not that all sentencing facts be found by

a jury, but that sentencing courts apply the guidelines as advisory. *Id.* at 259-60. The district court

here did so. The defendants' argument is therefore meritless, and in fact has already been rejected

by this court. *United States v. Davis*, 397 F.3d 340, 352 (6th Cir. 2005) (Cook, J., concurring); *see*

*also United States v. Wood*, 188 F. App'x 353, 354-55 (6th Cir. 2006).

## VIII. ORDERS OF FORFEITURE AND RESTITUTION

"We review the district court's interpretation of the federal forfeiture laws *de novo*. But the

district court's findings of fact are reviewed under a clearly erroneous standard and the question of

whether those facts are sufficient to constitute a proper criminal forfeiture is reviewed *de novo*."

*United States v. O'Dell*, 247 F.3d 655, 679 (6th Cir. 2001) (citations omitted). "'We review *de novo*

whether a restitution order is permitted under the law. If it is, then the amount of restitution ordered

is reviewed under the "abuse of discretion" standard.'" *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006) (quoting *United States v. Wood*, 364 F.3d 704, 714 (6th Cir. 2004)).

Mrs. Madison was ordered to forfeit $578,000, the sum of the $437,000 and $141,000 she converted from Cherokee. The judgment appears also to order, and the government to argue for, $147,000 and $437,000, the value of the checks that were proceeds of her unlawful transactions; and the parcels at 2771 Colony Park Drive and 2768 Colony Park Drive, also proceeds of the transactions. Mrs. Madison argues that the order to forfeit $578,000 "*in addition to* her real property is grossly disproportional to the gravity of the alleged offense." The forfeiture of the $578,000 Mrs. Madison converted is required by the terms of the forfeiture statute; a sentencing court "shall order" a person convicted of engaging in monetary transactions involving property derived from unlawful activity in violation of 18 U.S.C. § 1957 to "forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). Mrs. Madison's Brief at 57. At oral argument, the government conceded that "we can go no farther than $578,000." Therefore, the forfeiture of property in excess of that amount is no longer an issue.

Mrs. Madison's claim that the forfeiture amount was excessive under the Eighth Amendment is not meritorious. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Mrs. Madison possessed the $578,000 only because she misappropriated it from Cherokee, and the amount therefore bears a direct relationship to the offense it is designed to punish. Finally,

Mrs. Madison was not entitled to have the forfeiture amount found by a jury, because she expressly waived a jury determination. Fed. R. Crim. P. 32.2(b)(4); *see also United States v. Hall*, 411 F.3d 651, 654-55 (6th Cir. 2005) (finding no constitutional right to a jury determination of forfeiture).

Mrs. Madison was ordered to pay $751,832.04 in restitution. For $564,832.04 of that amount, which was based on tax losses to the IRS, she was jointly and severally liable with Mr. Madison. The remaining $187,000 was incurred by the receivership for Cherokee because the Cherry Center property, which Mrs. Madison deeded to Cherokee to cover the funds she converted under the guise of retroactive rent, sold for considerably less than the amount of the converted funds.

Mrs. Madison argues on appeal that the restitution amount was excessive and not supported by the evidence. A "district court must consider 'the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate' when ordering restitution." *United States v. Adams*, 214 F.3d 724, 730 (6th Cir. 2000) (quoting *United States v. Dunigan*, 163 F.3d 979, 981 (6th Cir. 1999)). The district court heard evidence at sentencing as to the amount of tax loss and loss to the receivership from the sale of the Cherry Center property.[7] It adopted the findings in the pre-sentence investigation report (the "PSIR"), which detailed the financial resources of the defendants, their earning ability, and their expenses. The district court thus considered all of the required factors.

---

[7]Both defendants incorrectly assert that the government failed to prove the amount of loss. They cite only the fact that the audit performed by TDHS found no losses as a result of their offenses. Because the TDHS audit examined losses to TDHS, and the receiver's testimony regarded losses to Cherokee itself, the results of the TDHS audit are irrelevant.

Moreover, contrary to the defendants' assertions, they have the ability to pay the restitution award. The PSIR here concluded that the defendants were able to pay restitution because they had a net worth of $978,781, or $421,630, after subtracting the properties included in the forfeiture order; and a net monthly income of $7,311. The PSIR also addressed the assets and income of both defendants. Based on these findings, which the district court adopted, the restitution amount is consistent with the defendants' financial resources.

## XI. SENTENCES

"The district court's decision to apply U.S.S.G. § 3B1.3 'is treated as a question of law in the Sixth Circuit. We review *de novo* the District Court's determination that [the defendant] occupied a position of trust for the purposes of the Sentencing Guidelines.'"[8] *United States v. Young*, 266 F.3d 468, 474 (6th Cir. 2001) (citation and some internal quotations omitted) (quoting *United States v. Brogan*, 238 F.3d 780, 783 (6th Cir. 2001)). This court examines the sentence itself to determine "whether [the] sentence is unreasonable." *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005) (quoting *Booker*, 543 U.S. at 262-63). This review is both substantive, examining "the length of the sentence," and also procedural, requiring that the district court consider the factors in 18 U.S.C. § 3553(a), including the advisory guidelines range. *Id.* (quoting *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005)).

---

[8]*But see United States v. Lang*, 333 F.3d 678, 682 (6th Cir. 2003) (citing *Buford v. United States*, 532 U.S. 59, 66 (2001)) ("We review the district court's application of § 3B1.3 under the 'clearly erroneous' standard where, as here, it is fact-bound."). The standard of review does not make a difference in this case, however, because the district court's determination was correct.

Although the Guidelines are merely advisory following *Booker*, "[s]entencing courts must still take the guidelines into account and must construe the guidelines properly in doing so." *United States v. Forrest*, 402 F.3d 678, 684 (6th Cir. 2005). The government argues that Mrs. Madison's offense level should have been adjusted upward two levels based on her abuse of trust. "If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense," the sentencing court must increase the offense level by two. U.S.S.G. § 3B1.3. However, "[t]his adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." *Id.*

The district court made the factual determination that Mrs. Madison was "enable[d] to perpetrate" the thefts from a program receiving federal funds in violation of 18 U.S.C. § 666(a)(1) "largely . . . because of her position." Transcript 3/31/05 at 120. In determining whether the adjustment applies, this court examines "whether the defendant held a position of trust, and whether the position of trust facilitated the commission of the crime." *United States v. White*, 270 F.3d 356, 371 (6th Cir. 2001). The official commentary to the Guidelines explains that a position of trust is

> characterized by professional or managerial discretion . . . . Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense . . . .

U.S.S.G. § 3B1.3, Application Notes 1. The record indicates that it was Mrs. Madison who instructed Cherokee's director of operations to write checks, including checks to herself for sizable amounts. She also had the ability to write checks herself, which she used on the occasion she wrote

a $250,000 check to the fictitious entity "Fund Management," by which device she was apparently able to conceal the conversion of those funds.

Given her use of authority to direct payments and write checks, Mrs. Madison clearly held a position of trust and relied on that position to convert Cherokee funds. In fact, this court held a defendant to have abused a position of trust based on substantially indistinguishable facts in *United States v. Freeman*, 86 F. App'x 35, 37-38, 43 (6th Cir. 2003) (chief executive officer of federally-funded non-profit "had a tremendous amount of discretion" and used that to cause the organization to pay her mortgages without the knowledge of the directors). Thus, the district court correctly determined that Mrs. Madison abused a position of trust as defined in § 3B1.3.

The district court determined that the § 3B1.3 adjustment should not be applied, however, because Mrs. Madison's "conviction on those [§ 666(a)(1)] counts fairly subsume[s] the argument of abuse of trust and . . . no further enhancement is warranted." Transcript 3/31/05 at 120. This court held in *United States v. Brown*, 66 F.3d 124, 129 (6th Cir. 1995), that abuse of trust is not "a necessary element of the crime of embezzlement" under 18 U.S.C. § 666(a)(1). Although the government must prove that the defendant is an agent of a government or organization receiving federal benefits to obtain a conviction under § 666(a)(1), it does "not have to prove the degree of independence and discretion that the enhancement provision requires." *Id.* Therefore, the district court erred in not applying the two-level enhancement under §3B1.3.

Because the district court erred in failing to make a two-level adjustment under § 3B1.3, Mrs. Madison's case must be remanded to the district court for resentencing consistent with that adjustment. *See United States v. Galloway*, 439 F.3d 320, 324 (6th Cir. 2006). However, Mrs.

Madison's sentence is otherwise procedurally and substantively reasonable under *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005), as is Mr. Madison's sentence.

The district court discussed each of the sentencing factors in 18 U.S.C. § 3553(a) in determining Mrs. Madison's sentence, and incorporated these comments in its sentencing deliberation regarding Mr. Madison. This consideration of the factors was sufficient; as this court has frequently observed, "satisfaction of the procedural reasonableness requirement does not depend on a district court's engaging in a rote listing or some other ritualistic incantation of the relevant § 3553(a) factors." *United States v. Dexta*, 470 F.3d 612, 615 (6th Cir. 2006).

A sentence is "substantively plainly unreasonable" where "it is 'greater than necessary to comply with the purposes set forth in [§ 3553(a)(2)].'" *United States v. Yopp*, 453 F.3d 770, 773 (6th Cir. 2006) (alteration in original) (quoting 18 U.S.C. § 3553(a)). The Guidelines yielded a range of forty-one to fifty-one months for Mrs. Madison, and thirty-three to forty-one months for Mr. Madison. The district court decided to sentence both Mr. and Mrs. Madison to sentences significantly lower than the guidelines ranges: twenty-one months' incarceration plus three years of supervised release for Mrs. Madison, and ten months' incarceration followed by three years' supervised release for Mr. Madison, with ten months of home confinement as a condition of supervised release. The district court based its decision not only on the factors in § 3553(a), but also

on Mrs. Madison's age and the fact that she was responsible to raise her five-year-old grandson, as well as the couple's standing in and support from the community.[9]

The government argues that the sentences are shorter than is necessary to comply with the purposes of § 3553(a). However, the government has not refuted the district court's finding that, even without any term of incarceration, neither defendant would commit an offense again. The government's arguments with respect to the magnitude of the sentences also fail to address the accompanying orders of forfeiture and restitution, which total over $1 million. Under all the circumstances, it appears that the district court's sentences were substantively reasonable.

## X. CONCLUSION

For these reasons, Mr. Madison's conviction and sentence are **AFFIRMED**, and Mrs. Madison's case is **REMANDED** for resentencing.

---

[9]Age, family responsibilities, and "employment-related contributions" and "prior good works" are discouraged factors for calculating Guidelines ranges. U.S.S.G. §§ 5H1.1, 5H1.6, 5H1.11. However, discouraged does not mean prohibited. *United States v. Bostic*, 371 F.3d 865, 875 (6th Cir. 2004). Moreover, the Sixth Circuit has held in an unpublished decision that although discouraged factors under the Policy Statements "were inappropriate for consideration under the mandatory guidelines, they provide a justification for a sentence decrease under the now-discretionary guidelines." *United States v. Briceno*, 136 F. App'x 856, 859 (6th Cir. 2005); *see also United States v. Jackson*, 408 F.3d 301, 305 (6th Cir. 2005).