**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0723n.06

**No. 08-2605**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
**Nov 18, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| CHARLES LEE EDKINS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: GILMAN and COOK, Circuit Judges; OLIVER, Chief District Judge.[*]

COOK, Circuit Judge. Charles Lee Edkins pleaded guilty to four counts of tax evasion for failing to timely file his tax returns for multiple years and for underreporting his income on those returns he did file. The district court sentenced him to 48 months' imprisonment, three years of supervised release, and $285,711 in restitution. Edkins appealed, claiming the statute of limitations barred his prosecution and challenging his advisory guidelines calculation and the restitution order. We affirm Edkins's conviction and sentence except with respect to the abuse-of-a-position-of-trust enhancement and the district court's order of restitution.

---

[*]The Honorable Solomon Oliver, Jr., Chief United States District Judge for the Northern District of Ohio, sitting by designation.

I.

Charles Edkins's tax evasion closely relates to his ownership of Baby Bliss, Inc. ("Baby Bliss"), a decades-old company that manufactured children's clothing. Edkins purchased an interest in Baby Bliss in 1983 and became its sole shareholder in 1990. Edkins's failure to file personal tax returns for 1995 through 1998 caused the IRS to scrutinize his tax liability, which included his personal use of Baby Bliss corporate funds. That scrutiny prompted the IRS to launch first an audit and then a criminal tax investigation.

This investigation unveiled that Edkins—who eventually filed returns for 1995, 1996, and 1997—had underreported his personal tax liability, failed to file corporate tax returns for Baby Bliss for fiscal years 1996 through 2000, and employed questionable accounting practices in compensating Baby Bliss employees. Between 1995 and 1998, nearly $979,000 was transferred from company bank accounts to Edkins's personal bank accounts, of which $335,500 was transferred back to Baby Bliss bank accounts. Using these funds, Edkins purchased two homes, a Corvette, and a Lincoln Town Car. Based in part on these transfers, the IRS concluded that Edkins failed to report a large portion of his income for the years 1995 through 1998 and owed $245,930 in unpaid personal taxes. The IRS further calculated that, for failing to file Baby Bliss corporate tax returns for fiscal years 1996 through 2000—a period during which the IRS determined Baby Bliss had gross sales of over $2.5 million—Edkins owed $31,135 in taxes. The IRS also faulted Edkins for failing to withhold payroll taxes, treating his employees as both subcontracted labor and actual employees during the

same year, and paying cash bonuses. According to the government, these practices—which led Baby Bliss employees to file incorrect individual tax returns—resulted in Baby Bliss underreporting its payroll FICA tax liability by $8,646. Combining the $245,930 in personal taxes, $31,135 in corporate taxes, and $8,646 in payroll FICA taxes owed, the IRS calculated a total tax loss of $285,711.

After this investigation, an IRS agent and an Assistant U.S. Attorney informed Edkins that they planned to seek an indictment against him. Edkins's attorney engaged in plea agreement discussions with the government. Before reaching a resolution, however, Edkins left the United States and moved to the Bahamas, transferring $380,000 from his Michigan bank accounts to a Bahamian branch of a Swiss bank. The government issued an indictment and warrant for Edkins's arrest. After being deported by the Royal Bahamas Police Force, Edkins pleaded guilty (without a plea agreement in place) to evading personal income taxes for calendar years 1995, 1996, 1997, and 1998. The Probation Department issued a presentence report (PSR) with a guidelines range of 30–37 months' imprisonment, based in part on the calculated tax loss ($285,711). Edkins objected to the tax-loss calculation as well as the application of the sophisticated-concealment and abuse-of-a-position-of-trust enhancements.

After hearing testimony from Edkins and two IRS agents, the district court found Edkins to lack credibility, adopted the factual findings in the PSR, overruled Edkins's objections to the PSR, and denied Edkins the PSR-recommended reduction for acceptance of responsibility. The court

recalculated Edkins's guidelines range as 41–51 months. It then sentenced him to 48 months' imprisonment followed by three years of supervised release and ordered Edkins to pay $285,711 in restitution. With the exception of $66,000 in checks that the government had seized from Edkins in the Bahamas, which the court ordered him to endorse at sentencing, Edkins has not paid the remaining restitution.

## II.

We first consider Edkins's affirmative defense that the statute of limitations has expired so as to bar his prosecution. He grounds this timeliness challenge on the date of offense completion—April 15, 1999—listed in both the PSR and the Amended Judgment issued in his case. He counts from that date to argue that the government's indictment issued beyond the six-year statute of limitations for tax evasion. *See* 26 U.S.C. § 6531. The tax-evasion statute of limitations begins to run on the date of the last "affirmative act of evasion." *United States v. Dandy*, 998 F.2d 1344, 1355 (6th Cir. 1993). The statute excludes from the calculation time during which the defendant "is outside the United States" or "a fugitive from justice." 26 U.S.C. § 6531. The government issued the indictment against Edkins on June 14, 2005. Edkins's claim fails even if we accept that the last affirmative act of evasion occurred on April 15, 1999. Edkins moved to the Bahamas on March 25, 2005—before the statute of limitations would have expired—and remained there until the indictment issued. As authorized by 26 U.S.C. § 6531, the court excludes this time outside the country from the statute-of-limitations calculation, rendering the indictment timely.

III.

Edkins challenges the calculation of his advisory guidelines range on a number of grounds, including the following: (a) amount of tax loss; (b) application of the acceptance-of-responsibility reduction; (c) application of the sophisticated-concealment enhancement; and (d) application of the abuse-of-a-position-of-trust enhancement. We review a district court's findings of fact related to the application of the advisory Sentencing Guidelines for clear error, and a district court's legal conclusions interpreting the guidelines de novo. *United States v. Tatum*, 518 F.3d 369, 372 (6th Cir. 2008).

A.      Tax Loss

After hearing testimony from two IRS agents and Edkins, the district court adopted the PSR tax-loss calculation of $285,711. Edkins argues that total tax loss should be $112,777 and that the district court's miscalculation stemmed from (1) treating "loans" from Baby Bliss to the defendant as income; (2) applying the wrong tax rate for 1998; and (3) including taxes owed by the defendant's corporation.

1.      Loans vs. Income

Edkins first contends that the court misconstrued the $290,000 that he withdrew from Baby Bliss to purchase two homes as income when it should have viewed the withdrawals as loans for $110,000 and $180,000. Treating the withdrawals as loans rather than income, as Edkins urges,

would decrease the total tax loss attributed to him, which in turn would decrease Edkins's base offense level. In determining whether a withdrawal from a business constitutes a loan, "the intention of the parties" controls the analysis. *Berthold v. Comm'r*, 404 F.2d 119, 122 (6th Cir. 1968). The parties must have "an actual intent that money advanced will be repaid." *Id*. This court considers the taxpayer's testimony that he intended to repay the money in question, but, especially when the alleged creditor and debtor are really one and the same, "such self-serving testimony 'can appropriately be viewed with some diffidence unless supported by other facts which bring the transaction much closer to a normal arms-length loan.'" *Jaques v. Comm'r*, 935 F.2d 104, 107 (6th Cir. 1991) (quoting *Berthold*, 404 F.2d at 122). Objective factors to consider include "[n]ormal [s]ecurity, interest and repayment arrangements (or efforts to secure same)." *Berthold*, 404 F.2d at 122. In contrast, a withdrawal constitutes income when "'its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.'" *United States v. Curtis*, 782 F.2d 593, 595 (6th Cir. 1986) (quoting *Davis v. United States*, 226 F.2d 331, 334 (6th Cir. 1955)). We review the district court's decision to treat the money as income for clear error. *See Jaques*, 935 F.2d at 107.

Although Edkins testified that he always intended to repay the loans upon the sale of the homes, [R. 58, Nov. 20, 2008 Hr'g Tr. 102, 131], the district court explicitly found Edkins's testimony not credible, [R. 57, Dec. 15, 2008 Hr'g Tr. 6–7, 10]. Moreover, because the creditor and debtor here are really one and the same, this court views Edkins's testimony with more skepticism unless other objective factors bring this case closer to a normal arms-length transaction. *See Jaques*,

935 F.2d at 107. Edkins points to such objective factors as his memorialization of the "loan" in two promissory notes, transfer of the mortgage to Baby Bliss, repayment of all but $15,000 of the money after the sale of the homes, and declaration of the unpaid interest as income on his 1996 and 1997 tax returns.

Edkins's use of the promissory notes executed between Baby Bliss and C.L.E., Inc. (a corporation Edkins created that had no income or expenses), undercuts rather than supports his argument. First, Edkins began transferring money from Baby Bliss to his personal account in 1995, but signed the promissory notes many months later, in April 1996 and August 1997. This time gap "militates against assigning much weight" to the promissory notes. *Patrick v. Comm'r*, 75 T.C.M. (CCH) 1629, 1633 (1998), *aff'd*, No. 98-1487, 1999 WL 282613 (6th Cir. Apr. 30, 1999). Second, though the promissory notes specified a monthly payment schedule, by interlineation Edkins edited the notes' terms to allow him to waive any payment default. Furthermore, the form notes lacked a deadline for full repayment and required no security, undermining the legitimacy of his stance. *See Dietrick v. Comm'r*, 881 F.2d 336, 340 (6th Cir. 1989); *Bergersen v. Comm'r*, 70 T.C.M. (CCH) 568, 586 (1995), *aff'd*, 109 F.3d 56 (1st Cir. 1997).

Edkins's assertion that he repaid the funds to Baby Bliss similarly fails to support his claim. According to the PSR, after reviewing bank records and other information, an IRS agent determined that Edkins made it look as though he returned the funds to Baby Bliss when he had not actually done so. [PSR ¶ 35]. Even if Edkins did transfer the funds from the sale of the homes to Baby Bliss,

the manner in which he contends he did demonstrates he lacked "an actual intent that money advanced [would] be repaid." *Berthold*, 404 F.2d at 122. With respect to the $110,000 alleged loan, Edkins claims he received $95,423.30 upon sale and returned only this amount to Baby Bliss. With respect to the $180,000 loan, he sold the property for $232,268.60 and supposedly returned $180,000 of that to Baby Bliss. Edkins claimed that he would report the approximately $15,000 shortfall as income on his 2000 tax returns, but he never filed these returns. These records, even taken at face value, suggest that Edkins had such control over the money that he "'derive[d] readily realizable economic value from it.'" *See Curtis*, 782 F.2d at 595 (quoting *Davis*, 226 F.2d at 334).

Edkins, moreover, admitted that he purchased the property in question for his own use. He borrowed the home-purchase funds from Baby Bliss, and arranged the transaction so that he could forgo making the loan payments. This arrangement precisely matches the situation this court cautioned against when explaining that, without evidence of the typical corporate formalities accompanying a loan, "a sole owner of a corporation could have his personal expenses paid by the corporation as a loan and postpone repayment indefinitely, thus escaping the double taxation which is normally incident to the corporate form." *Jaques*, 935 F.2d at 109. In light of all the other evidence, we are unpersuaded by Edkins's contention that, because he provided Baby Bliss with mortgage deeds to the properties and reported unpaid loan interest as income, the district court clearly erred in treating the loaned funds as income.

2. Tax Rate

Edkins next claims that the district court incorrectly calculated the total tax loss with respect to his unfiled 1998 tax return by accepting the IRS's calculation rather than applying a 20% tax rate. Where an offense involves a failure to file a tax return, "the tax loss shall be treated as equal to 20% of the gross income . . . unless a more accurate determination of the tax loss can be made." U.S.S.G. § 2T1.1(c)(2)(A). "These presumptions apply unless the parties provide sufficient information for a more accurate assessment of tax loss." *United States v. Harris*, 200 F. App'x 472, 495 (6th Cir. 2006) (citing U.S.S.G. § 2T1.1(c)(2)(A) cmt. n.1).

The government calculated Edkins's tax rate by examining Edkins's and Baby Bliss's banking records, including records of transfers from Baby Bliss's accounts to Edkins's personal accounts, and then applying standard adjustments and the standard tax rate. Edkins objects, maintaining that the 1998 tax loss cannot be accurately determined "because in 1998 there were no records by which to compute all of the deductions, exemptions, and credits to which he was entitled."

Edkins still has not filed a tax return for 1998, nor does he identify any specific deduction, exemption, or credit that the government failed to apply. The fact that Edkins (had he filed a return) may have taken advantage of additional deductions, exemptions, or credits does not prevent the government's calculation—using bank records, standard deductions, and a standard tax rate—from being "more accurate" than application of a flat rate to Edkins's gross income. *See United States*

*v. Delfino*, 510 F.3d 468, 473 (4th Cir. 2007) (explaining that the law does not require the district court to speculate as to what deductions the defendant may have been entitled to had he completed his tax returns). The district court did not clearly err in sanctioning this method of calculating Edkins's 1998 tax liability.

3. Unpaid Corporate Taxes

Finally, Edkins challenges the inclusion of $31,135 in taxes allegedly owed by Baby Bliss for tax years 1999–2000 on the grounds that his guilty plea encompassed tax violations only for the years 1995–1998. Commentary to U.S.S.G. § 2T1.1, however, provides that, in determining the tax loss attributable to the offense, "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1 cmt. n.2. This court has held that "'all conduct violating the tax laws' must refer to all relevant criminal conduct underlying the charged offense," *United States v. Daniel*, 956 F.2d 540, 544 (6th Cir. 1992) (emphasis omitted), and that the guidelines permit "the use of tax loss resulting from uncharged [criminal] conduct" in calculating total tax loss, *United States v. Pierce*, 17 F.3d 146, 150 (6th Cir. 1994). Edkins's failure to file corporate tax returns for Baby Bliss in 1999 and 2000 qualifies as such relevant, uncharged criminal conduct. Accordingly, the district court did not clearly err by including these funds in the tax-loss calculation.

B.        Acceptance of Responsibility

Edkins maintains that he should receive the PSR-recommended acceptance-of-responsibility reduction for the following reasons:  he pleaded guilty to four counts of the indictment before the first pretrial conference; admitted to evading income taxes for calendar years 1995–1998 at his plea hearing and his sentencing hearing; and answered questions at his sentencing hearing regarding the amount of taxes owed, the money taken from Baby Bliss to buy real estate, his move to the Bahamas, and his deposit of funds in a Swiss bank account.   The guidelines permit an acceptance-of-responsibility reduction upon consideration of factors including the defendant's "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable" and "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility."  U.S.S.G. § 3E1.1 cmt. n.1. An "overall deferential scope of review" steers § 3E1.1 determinations because they "involve an overall legal decision that is fact-bound, the district court has comparatively great expertise, and the value of uniform court of appeals precedent is limited."  *United States v. Bolden*, 479 F.3d 455, 464 (6th Cir. 2007).

Several negative credibility assessments drove the district court to reject the PSR-recommended reduction.  *See* Dec. 15 2008 Hr'g Tr. 6–7, 10.  No error results because a defendant may properly be denied such a reduction "'if the court believes the defendant testified untruthfully,'"

as the district court found here.  *See United States v. Lay*, 583 F.3d 436, 448 (6th Cir. 2009) (quoting

*United States v. Bonds*, 48 F.3d 184, 189 (6th Cir. 1995)).

C.      Sophisticated Concealment

Edkins next challenges his sophisticated-concealment enhancement.[1]  The guidelines define

"sophisticated concealment" as "complex or especially intricate offense conduct in which deliberate

steps are taken to make the offense, or its extent, difficult to detect."  U.S.S.G. § 2T1.1(b)(2) cmt.

n.4.  "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities,

corporate shells, or offshore financial accounts ordinarily indicates sophisticated concealment."  *Id*.

A court may ground its finding of sophisticated concealment on a series of actions as a whole, even

if the actions individually do not demonstrate sophistication.  *United States v. Tandon*, 111 F.3d 482,

491 (6th Cir. 1997).

According to the PSR—which the district court endorsed—Edkins engaged in sophisticated

concealment by using a fictitious entity or shell corporation; structuring financial transactions for

the purpose of evading currency-transaction reporting requirements; creating fictitious loan

documents to purchase one or more residences; using an offshore bank account; falsifying

employees' 1099 forms and bypassing the company's payroll account in favor of the general bank

---

[1]The guidelines now refer to this enhancement as "sophisticated means."

account in paying employees; and attempting to hide personal income and funds taken from Baby Bliss through sham transactions.  [PSR ¶ 63].

Edkins's conduct justified the district court's application of this enhancement because Edkins engaged in two prototypical examples of sophisticated concealment—using a corporate shell and moving money offshore. *See* U.S.S.G. § 2T1.1(b)(2) cmt. n.4.  Such conduct plainly establishes that, in contrast to the typical tax evader, Edkins did more than "simply lie[] on a 1040 form." *United States v. Clear*, 112 F. App'x 429, 431 (6th Cir. 2004) (internal quotation marks and citation omitted).  Yet Edkins maintains that these actions "had nothing to do with his evasion of income taxes." [Appellant Br. 27].  Regardless, the district court could properly consider conduct related to Edkins's tax evasion in determining whether to enhance for sophisticated concealment. *See* U.S.S.G. § 1B1.3(a)(1) (explaining that courts should determine specific offense characteristics based on "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense").

D.      Abuse of a Position of Trust

Edkins next urges that the district court improperly applied an enhancement for abuse of a position of trust.  The guidelines call for a two-level increase when "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the

commission or concealment of the offense." U.S.S.G. § 3B1.3. "[T]he level of discretion accorded an employee is to be the decisive factor in determining whether his position was one that can be characterized as a trust position." *United States v. May*, 568 F.3d 597, 603 (6th Cir. 2009) (alteration in original) (internal quotation marks and citation omitted). "The abuse-of-trust enhancement may only be applied where the defendant abused a position of trust with the victim of his charged conduct." *United States v. White*, 270 F.3d 356, 371 (6th Cir. 2001).

The district court adopted the PSR's recommended application of an abuse-of-trust enhancement because Edkins presented himself as a certified public accountant to his employees and implemented unusual accounting practices at Baby Bliss, such as treating employees as independent contractors for the first three months of the year. When employees questioned these practices, Edkins vouched for their propriety. Focusing on the Sixth Circuit requirement that an abuse-of-trust enhancement may be applied only when the defendant abused a position of trust with the victim of the charged conduct, Edkins correctly maintains that this enhancement does not fit and that the district court erred in relying upon his abuse of his position of trust with Baby Bliss to justify the enhancement. *See id.* Just as in *May*, another tax-evasion case, Edkins's conduct shorted the IRS, rendering it—not Baby Bliss—the victim of Edkins's tax evasion. 568 F.3d at 603–04. Because tax laws obliged Edkins only "to collect the money and pass it along to the government"—a non-discretionary duty similar to that of a bank teller—we agree with Edkins that he did not occupy a position of trust with the IRS. *See id.* at 603.

IV.

Apparently focused on the significant balance in Edkins's Swiss bank account, the district court ordered Edkins to pay $285,711 in restitution, with $200,000 due immediately and the remainder payable during Edkins's period of supervised release. Edkins challenges the court's authority to order restitution paid immediately rather than as a condition of supervised release. This court reviews de novo whether the law permits a restitution order and, where the law does permit such an order, reviews the amount of restitution ordered for abuse of discretion. *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006).

The district court found that the IRS suffered a compensable injury under the Victim and Witness Protection Act (VWPA) and ordered $285,711 in restitution, with $200,000 payable immediately. [R. 57, Dec. 15, 2008 Hr'g Tr. 50–51]. Under the VWPA, courts may order restitution by defendants convicted under Title 18 or certain enumerated sections of Titles 21 or 49. 18 U.S.C. § 3663. Because Edkins pleaded guilty to violating 26 U.S.C. § 7201—an offense to which the VWPA does not apply—the court lacked authority to order VWPA restitution. *See* 18 U.S.C. § 3663 (enumerating applicable offenses); *United States v. Anderson*, 545 F.3d 1072, 1077 (D.C. Cir. 2008) (explaining that the VWPA does not authorize restitution for violation of 26 U.S.C. § 7201), *cert. denied*, 129 S. Ct. 2445 (2009); *United States v. Butler*, 297 F.3d 505, 518 (6th Cir. 2002) ("[T]he VWPA does not apply to Title 26 offenses such as tax evasion."). In support of its decision, the district court cited *United States v. Madison*, 226 F. App'x 535 (6th Cir. 2007), a case upholding an

award of restitution ordered pursuant to the VWPA.  In *Madison*, though, the defendant challenged

the restitution award as excessive and unsupported by the evidence; she did not challenge the

statutory basis of the award or the requirement for immediate payment.  226 F. App'x at 548–49.

In the absence of statutory authority for this restitution order, we vacate that portion of the sentence.[2]

V.

For the above reasons, we AFFIRM Edkins's conviction, VACATE his sentence and

restitution order, and REMAND for resentencing proceedings consistent with this opinion.

---

[2]Edkins additionally claims that the district court failed to adequately consider his medical condition and subsistence needs when ordering restitution.  Although we vacate the restitution order, we note that reviewing the record confirms the district court's evaluation of Edkins's testimony on this subject, rendering this contention baseless.  [*See* R. 58, Nov. 20, 2008 Hr'g Tr. 115–17, R. 57, Dec. 15, 2008 Hr'g Tr. 33–36].