United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 20, 2003**

Charles R. Fulbruge III
Clerk

Revised December 10, 2003

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————————

No. 03-60010

———————————————————

DIJO, INC.

Plaintiff-Appellee,

versus

HILTON HOTELS CORP., PARK PLACE ENTERTAINMENT CORP.; THE GRAND
CASINO, INC.; BL DEVELOPMENT CORP.; and BL RESORTS I L.L.C.

Defendants-Appellants.

———————————————————————————————————————

Appeal from the United States District Court
for the Northern District of Mississippi

———————————————————————————————————————

Before JOLLY and WIENER, Circuit Judges, and WALTER, District
Judge.[*]

WIENER, Circuit Judge:

    After a trial in which the jury found for the Plaintiff-
Appellee DIJO, Inc. and awarded it $8 million in damages, the
Defendants-Appellants appeal, alleging numerous errors that
purportedly occurred in the district court.  For the reasons
explained below, we affirm the judgment on the jury's finding of
liability but remand for a new trial on the issue of damages.

———————————

    [*] District Judge for the Western District of Louisiana,
sitting by designation.

## I.  BACKGROUND FACTS

DIJO, Inc. ("DIJO") is a two-person company formed by Jo Bursley, a mortgage broker involved with developing hotel properties, and Jay Turner, a veteran developer of large, complex commercial real estate ventures.  The Defendants are Grand Casinos, Inc. ("Grand"), two subsidiaries, BL Development Corp. and BL Resorts I, L.L.C. ("BLR"), Hilton Hotels, Corp. ("Hilton") and Park Place Entertainment ("Park Place").

Early in June, 1998, Grand's subsidiary, BLR, granted a forty-nine year ground lease (the "Lease") to DIJO covering land near Grand's casino in Tunica, Mississippi (the "property").  DIJO leased the property from BLR for the purpose of developing and constructing a Comfort Suites Hotel (the "Project" or "the hotel") whose guests would primarily be Grand's casino patrons.  The Lease provided that DIJO would pay rent based primarily on the hotel's gross receipts.

Less than one month after the Lease was executed, Grand and Hilton announced that, effective December 31, 1998, Grand's non-Indian gaming interests and Hilton's gaming interests would be contributed to a newly-formed corporate entity, Park Place, which would be owned by Grand and Hilton.  This transaction was the product of confidential discussions between the companies which had commenced as early as fall 1997.  Even so, Hilton did not learn of the Lease until after the Park Place formation was announced.

2

Shortly after that announcement, putative executives of the soon-to-be-formed Park Place began reviewing Grand's capital expenditures and decided that they were not interested in having DIJO's hotel on the property. As a result, Grand offered to purchase DIJO's interest in the Lease.

In initiating buyout negotiations with DIJO, Grand professed to be "ready, willing and able to proceed" with the deal, but nevertheless advised DIJO that the Project was no longer in Park Place's "best interest." Consequently, Grand wanted to reach an agreement with DIJO to cancel the Lease and asked DIJO for a buyout figure. While discussions of the potential buyout were proceeding, the Project was placed on "hold." After DIJO submitted an offer to sell its interest in the Lease for $1.15 million, however, Grand apparently reversed course, informing DIJO that proceeding with the Project as originally planned would be in Grand's best interest. Grand advised DIJO that Grand would "issue an amendment to the lease to allow for the additional time to commence construction" as a consequence of the delay caused by the intervening buyout discussions.

According to DIJO, though, irreparable damage had already been done. DIJO notified Grand that Grand's conduct "cast a cloud over the project making it unsalvageable." DIJO asserted further that Grand's "adverse positions" constituted a breach of the Lease, jeopardizing the Project and causing DIJO substantial damage. The

3

parties' subsequent negotiations failed, and this litigation followed. The district court entered judgment on the basis of the jury's verdict, and the Defendants timely filed their notice of appeal.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

The Defendants argue that the district court wrongly denied their motions for summary judgment, directed verdict, and new trial. In effect, they appeal the district court's denial of judgment as a matter of law. As such a challenge contests the sufficiency of the evidence to support the jury's verdict, we exercise <u>de novo</u> review.[1] The Defendants also appeal several evidentiary rulings. A district court's evidentiary ruling will not be reversed absent a clear abuse of discretion.[2] Our application of these standards is explained more fully below.

### B. LIABILITY

Two of DIJO's liability claims went to trial. One was DIJO's claim for breach of contract asserted against all Defendants except Hilton. The essence of this claim is that, through the circumstances surrounding the buyout offer and the ambiguous

---

[1] <u>Coffel v. Stryker Corp.</u>, 284 F.3d 625, 630 (5th Cir. 2002).

[2] <u>Doddy v. Oxy USA, Inc.</u>, 101 F.3d 448, 459 (5th Cir. 1996).

4

decision to put the Project on hold,[3] the Defendants made it impossible for DIJO to perform under the Lease. Therefore, DIJO asserted that — despite their ostensible willingness to carry on with the Project — the non-Hilton Defendants effectively repudiated the Lease through their conduct.

Second, DIJO brought a claim against Hilton for tortious interference with the Lease. DIJO charged that Hilton induced Grand to breach the Lease because Hilton did not want a competitor's hotel near the Tunica casino in which Hilton had an interest.

On appeal, the Defendants challenge the sufficiency of evidence supporting the verdict against them on DIJO's claim for breach of contract. The Defendants also complain that the district court should not have allowed the jury to consider DIJO's tortious interference claim against Hilton. Because the jury returned a general verdict for DIJO, however, it is impossible to tell whether the jury found for DIJO on one or both of its causes of action. We must, therefore, analyze each liability theory to determine whether it is sustained by the evidence and is legally sound.[4]

**1.   Breach of Contract Claim: Sufficiency of the Evidence**

---

[3] The parties disputed precisely what it meant that the Project was put on "hold." DIJO argued that putting the Project "on hold" was tantamount to cancelling the Project completely. The Defendants contended, on the other hand, that only the deadlines in the Project timetable were abated pending buyout negotiations.

[4] Nowell By and Through Nowell v. Universal Elec. Co., 792 F.2d 1310, 1312 (5th Cir. 1986).

5

As the Defendants properly preserved their legal challenges to the sufficiency of the evidence to support the jury's verdict, we exercise <u>de novo</u> review of the district court's denial of judgment as a matter of law.[5] We can enter judgment as a matter of law for the Defendants only if the facts and inferences point so strongly and overwhelmingly in the Defendants' favor that no reasonable jurors could have found for DIJO.[6]

As noted earlier, DIJO's breach of contract theory — and the way that it was submitted to the jury[7] — was that the Defendants breached the Lease by preventing DIJO's performance. DIJO maintained that the Defendants' confusing conduct made it impossible for DIJO to resume performance after buyout negotiations failed.[8] The Defendants respond that BLR's offer to buy DIJO's interest in the Lease did not breach the Project agreement. The

---

[5] <u>Coffel</u>, 284 F.3d at 630.

[6] See <u>id.</u>

[7] The jury instruction on breach of contract stated: "Unless you find that these Defendants refused or made it impossible for DIJO, Inc. to construct and manage a Comfort Inn hotel in Tunica, Mississippi, then you must find for these Defendants as to the Plaintiff's claim for breach of contract."

[8] Although few cases exemplify this type of breach of contract claim, Mississippi law appears to permit it. <u>See, e.g.</u>, <u>Bolling v. Red Snapper Sauce Co.</u>, 53 So. 394, 394-95 (Miss. 1910) (recognizing that where a plaintiff failed to perform because of the defendant's breach, the plaintiff could recover damages caused by the defendant's breach); <u>Gravette v. Golden Saw Mill Trust</u>, 154 So. 274, 275 (Miss. 1934) (letting the jury decide whether a totality of circumstances could support an inference that the defendant breached its contract and intended to prevent the plaintiff from ever performing).

6

Defendants also represent that, at all times, they stood ready, willing and able to perform; but that, by accepting BLR's invitation to discuss a buyout, DIJO agreed to put the Lease deadlines on hold. Finally, the Defendants argue that when buyout negotiations ceased, it was DIJO, not the Defendants, who refused to perform.

The jury apparently did not find the Defendants' version of the story credible. After reviewing the trial record, we find that, even if the evidence supporting liability was thin, it certainly was not so lacking as to entitle the Defendants to judgment as a matter of law.[9] Furthermore, we are loath to overturn a jury's determination when, as here, a contract claim is submitted to the jury under a theory requiring the fact-finder to examine the totality of the circumstances surrounding a defendant's actions.

Here, the facts and inferences do not point so strongly and overwhelmingly in the Defendants' favor that no reasonable jury could find for DIJO. We therefore affirm the jury's liability verdict on DIJO's breach of contract claim against the non-Hilton Defendants.

## 2. Tortious Interference Claim Against Hilton[10]

---

[9] See Coffel, 284 F.3d at 630.

[10] Although DIJO's tortious interference claim was advanced against Hilton only, all of the Defendants appealed its submission to the jury, presumably because of our rule that, in cases alleging multiple theories of liability, a general verdict will be upheld

In their challenge to the jury's being allowed to consider DIJO's state law tortious interference claim,[11] the Defendants effectively raise two legal arguments,[12] neither of which has merit.

a. Did the district court apply the wrong intent standard?

The Defendants first argue that they were entitled to a Rule 50 judgment on the tortious interference claim. Some Mississippi cases addressing tortious interference with contract have used the term "malice" to describe the intent element of this cause of action. For example, in Cenac v. Murry,[13] the Mississippi Supreme Court stated that "[a]n action for interference with contract will ordinarily lie when a defendant maliciously interferes with a valid and enforceable contract, thereby causing one party not to perform and resulting in injury to the other contracting party."[14] In

---

only if each of the several theories is sustained. See Nowell, 792 F.2d at 1312.

[11] The district court granted the Defendants' Rule 50 motion on DIJO's claim of tortious interference with business relations, but let DIJO proceed on its claim of tortious interference with contract.

[12] In passing, the Defendants also contend that they are entitled to judgment as a matter of law on DIJO's tortious interference claim "since no cause of action may lie for an unbreached contract." Because we hold that the Defendants are not entitled to judgment as a matter of law on DIJO's breach of contract claim, see discussion supra Part II.B.1, the Defendants' sufficiency of evidence contention vis-à-vis the tortious interference claim fails by necessity.

[13] 609 So.2d 1257 (Miss. 1992).

[14] Id. at 1268 (emphasis added).

ruling on the Defendants' Rule 50 motion, here, the district court concluded that Hilton's actions rose to the level of "recklessness" or "cold indifference." The Defendants seize upon this terminology in asserting that the district court applied the wrong standard to govern the element of intent.

The Defendants misconstrue the meaning of "malice," which, in this context, is simply "the intentional doing of a harmful act without justification or excuse."[15] The Mississippi Supreme Court has clarified that "[m]aliciousness does not necessarily mean actual malice or ill will, but the intentional doing of a wrongful act without legal or social justification."[16] Thus, the district court's holding that Hilton's actions were reckless as a matter of law can support DIJO's tortious interference claim.[17]

b. Did the district court submit contradictory instructions to the jury?

The Defendants' second appellate point concerning the tortious interference claim is that, because it was impossible for Hilton to

---

[15] MacKenzie v. Chrysler Corp., 607 F.2d 1162, 1165 (5th Cir. 1979) (quoting Mid-Continent Tel. Corp. v. Home Tel. Co., 319 F. Supp. 1176, 1200 (N.D. Miss. 1970)).

[16] Cranford v. Shelton, 378 So.2d 652, 655 (Miss. 1980) (quoting Ramando v. Pure Oil Co., 48 A.2d 156, 160 (Pa. Super. 1946)). See also Cockerham v. Kerr-McGee Chem. Corp., 23 F.3d 101, 105-06 (5th Cir. 1994).

[17] See Mid-Continent Tel. Corp., 319 F. Supp. at 1200 (finding that, under Mississippi law, "recklessly and deliberately" inducing a party to breach an agreement may constitute tortious interference with contract).

interfere with its own contract,[18] "[a]llowing the jury to consider both instructions violates basic principles of law and constituted reversible error." The Defendants are simply wrong. The jury instructions were clear that DIJO's tortious interference claim was only against Hilton and that DIJO's breach of contract claim was only against the other defendants.

Finding no reversible error with the jury's verdict on liability, we now turn to the damages issues.

## C. DAMAGES

The Defendants raise several issues on appeal regarding the jury's $8 million damages award. For the reasons explained below, we hold that the trial court erroneously admitted opinion testimony from Kerry Skinner, one of DIJO's lay witnesses on lost future profits; and that, because we find that Skinner's improperly-admitted testimony affected the Defendants' substantial rights, the jury's damage award cannot stand. We, therefore, vacate that award and remand for a new trial on damages only.

The Defendants contend that the trial court abused its discretion in admitting non-expert opinion testimony from Kerry Skinner (the representative of DIJO's potential lender) and Jay Turner (DIJO's vice president) about the future profits DIJO lost as a consequence of the Project's termination. It is well-established that a district court's evidentiary rulings are

_____

[18] See Ham Marine, Inc. v. Dresser Indus., Inc., 72 F.3d 454, 462 (5th Cir. 1995).

entitled to substantial deference and are not subject to reversal on appeal absent a clear abuse of discretion.[19] We address each witness in turn.

## 1. Kerry Skinner

Skinner is a financial consultant with advanced degrees in economics and extensive experience in real estate finance. During the relevant period, he served as DIJO's primary contact at ORIX USA Corporation ("ORIX"), a commercial lender which was planning to provide DIJO's construction loan for the hotel. Skinner testified that, based on projected earnings of $1 million per year, the value of the Project to DIJO was $8,000,007 — not, strictly speaking, that the lost profits were $8 million.[20] More to the point, Skinner's testimony revealed that he had little significant actual knowledge about DIJO and its operations. Thus, argue the Defendants, Skinner's lay opinion testimony about DIJO's financial loss should have been excluded.

Federal Rule of Evidence 701 was amended in 2000 to prohibit lay witnesses from offering opinions based on "scientific technical or other specialized knowledge within the scope of Rule 702."[21] We have previously recognized that "the amendment did not place any

---

[19] Doddy, 101 F.3d at 459.

[20] The district court allowed Skinner to proffer this testimony over the Defendants' objection to Skinner "offering testimony as to what th[e] hotel could generate."

[21] Texas A&M Research Found. v. Magna Transp., Inc., 338 F.3d 394, 403 n.12 (5th Cir. 2003).

11

restrictions on the preamendment practice of allowing business owners or officers to testify based on particularized knowledge derived from their position."[22] Nevertheless, it has always been the rule that lay opinion testimony may be elicited only if it is based on the witness's first-hand knowledge or observations.[23] This foundational requirement helps to eliminate the risk that a party will circumvent the reliability requirements set forth in Federal Rule of Evidence 702 by adducing expert testimony in lay witnesses' clothing.[24]

Based on his own admissions on the stand, Skinner simply did not have the requisite first-hand, personal knowledge about DIJO and the Project necessary to qualify as a Rule 701 opinion witness. His opinion about what the Project "could" generate was based on preliminary income figures and other information that he had received from Bursley. Skinner performed his own appraisal, but nothing in the record indicates that this was based on his own independent knowledge or observations.

It is telling that DIJO responds to this not with evidence of Skinner's involvement with DIJO or the Project, but only by

---

[22] Id. (emphasis added) (citing Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1222-23 (11th Cir. 2003)).

[23] FED. R. EVID. 701 advisory committee's note to 1972 proposed rules. See also United States v. Rea, 958 F.2d 1206, 1215 (2d Cir. 1992).

[24] See FED. R. EVID. 701 advisory committee's note to 2000 amendments.

emphasizing Skinner's substantial business experience. DIJO states that, for approximately twenty years, Skinner has been involved in commercial real estate financing, including work on hotel projects. Such generic industry experience does not pass Rule 701 scrutiny. DIJO never attempted to qualify Skinner as an expert; and a lay witness who was never employed by or directly involved in a business is unlikely to have the type of first-hand knowledge necessary to provide reliable forecasts of furture lost profits. The further removed a layman is from a company's day-to-day operations, the less likely it is that his opinion testimony will be admissible under Rule 701.[25]

DIJO cites only two cases in which an individual who was not a current or former employee, officer, or director of a business was permitted to provide lay opinion testimony about the company's lost profits, neither of which helps DIJO. In In re Merritt Logan, Inc.,[26] the plaintiff company's principal shareholder, Logan, was permitted to testify about the company's lost profits.[27] The facts recited in that opinion demonstrate that Logan was not a passive, outside shareholder; he was intimately involved with the

---

[25] Compare Mississippi Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 373-74 (5th Cir. 2002); Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 265 (2d Cir. 1995); State Office Sys., Inc. v. Olivetti Corp. of Am., 762 F.2d 843, 846 (10th Cir. 1985).

[26] 901 F.2d 349 (3d Cir. 1990).

[27] Id. at 360.

investments and management of the business.[28] Thus, the Third Circuit correctly concluded that Logan could provide lay opinion testimony, given his personal knowledge of the enterprise. Likewise, in <u>Teen-Ed, Inc. v. Kimball Int'l, Inc.</u>,[29] the Third Circuit decided that the appellant Teen-Ed's licenced public accountant, Zeitz, could provide lost profits opinion testimony.[30] Zeitz's testimony was based on the personal knowledge of Teen-Ed's balance sheets, which Zeitz had acquired first-hand as Teen-Ed's accountant and bookkeeper. This, the court concluded, qualified Zeitz as a "witness eligible under Rule 701 to testify to his opinion of how lost profits could be calculated and to inferences that he could draw from his perception of Teen-Ed's books."[31] Logan and Zeitz —— but not Skinner —— were situated in positions comparable to in-house employees.

Given Skinner's total lack of direct and particularized knowledge about DIJO, this was not a close evidentiary call. We therefore conclude that the district court abused its discretion when it allowed Skinner to venture an opinion about DIJO's lost profits.

This does not end our inquiry, though, because we reverse

---

[28] <u>See</u> <u>id.</u> at 354-55.

[29] 620 F.2d 399 (3d Cir. 1980).

[30] <u>Id.</u> at 403.

[31] <u>Id.</u>

14

judgments for improper evidentiary rulings only when a challenged ruling affects a party's substantial rights.[32]  In the instant context, however, this requires no great leap:  Skinner's testimony valued the Project at $8,000,007, and the jury awarded DIJO an even $8 million in lost future profits.  This virtually complete convergence convinces us that the jury relied almost entirely on Skinner's erroneously admitted testimony in reaching its damages award.  Indeed, after Skinner was allowed to testify, DIJO decided not to call its damages expert, who, based on his written report, was expected to testify that the Project was only worth approximately $4.3 million.

Furthermore, nothing else in the record could reasonably sustain an $8 million lost profits award.  DIJO maintains that Bursey's testimony — which at different times projected revenues of between $700,000 and $1 million per year — provides independent support for the $8 million damages award.  At oral argument, though, DIJO's counsel admitted that Skinner was the <u>only</u> witness at trial to express an $8 million figure.  Not only do we find it hard to believe that Bursey's testimony alone could have enabled the jury to extrapolate an $8 million lost profits calculation, but we doubt that this evidence satisfies Mississippi's "reasonable certainty" standard for calculating lost future profits.[33]

---

[32] <u>Gabriel v. City of Plano</u>, 202 F.3d 741, 745 (5th Cir. 2000).

[33] <u>See</u> <u>Lovett v. E.L. Garner, Inc.</u>, 511 So.2d 1346, 1353 (Miss. 1987) ("In calculating loss of future profits, such loss is that of

15

We, therefore, hold that the improvident admission of Skinner's opinion testimony requires vacatur of the quantum of the jury's damage award and remand for a new trial solely on the issue of damages.

## 2. Jay Turner

The Defendants also contend that the district court erred when it permitted Turner to testify about DIJO's lost profits. Turner testified that the proposed hotel would have generated a net income of $633,000 per year. Based on that projection, he offered his opinion that the business would have been worth $5.45 million if sold in its fifth year. Turner was one of DIJO's two principals, and his estimates were based on his own involvement in developing the Project. In light of the foregoing discussion of the boundaries of Rule 701, we cannot conclude that the district court abused its discretion in admitting Turner's lost profits testimony.[34]

---

net profits as opposed to gross profits. To ascertain net profits, a party must deduct such items as overhead, depreciation, taxes and inflation. Further, future profits should always be discounted at an appropriate rate to arrive at present value. And, finally, the plaintiff must mitigate damages if he is able to do so.") (citations omitted).

[34] Because we are remanding this matter for a new trial on damages, we need not decide whether Turner's testimony, standing alone, could satisfy Mississippi's reasonable certainty standard for the calculation of lost profits. See supra note 33.

### III.  CONCLUSION

Because we vacate the damages awarded by the jury and remand for a new trial on damages only, we need not reach the other issues raised by the Defendants on appeal.  In conclusion, we AFFIRM the district court's judgment insofar as it reflects the jury's verdict of liability.  We REVERSE the judgment as to damages, however, VACATE the jury's award, and REMAND for a new trial on the issue of damages only.

AFFIRMED in PART; REVERSED and VACATED in PART; and REMANDED.