382 B.R. 599 (2008)
In re PERRY H. KOPLIK & SONS, INC., Debtor.
Michael S. Fox, as Litigation Trustee of Perry H. Koplik & Sons, Inc., Plaintiff,
v.
Michael Koplik and Alvin Siegel, Defendants.
Bankruptcy No. 02-40648 (REG), Adversary No. 04-02490 (REG).
United States Bankruptcy Court, S.D. New York.
February 19, 2008.
Satterlee, Stephens, Burke & Burke LLP by Christopher R. Belmonte, Esq., *600 Pamela A. Bosswick, Esq., New York City, for Plaintiff.
Seward & Kissel LLP by Ronald L. Cohen, Esq., Walter A. Naeder, Esq., New York City, for Defendants.
Sanford P. Rosen & Associates, P.C. by Sanford P. Rosen, New York City, Esq., for Defendants.

BENCH DECISION ON MOTIONS TO STRIKE LAY WITNESS TRIAL TESTIMONY
ROBERT E. GERBER, Bankruptcy Judge.
In this adversary proceeding under the umbrella of the confirmed chapter 11 case of Debtor Perry Koplik & Sons, the plaintiff Litigation Trustee charges former insiders of the Debtor with breach of fiduciary duty. In the trial of the action, the Litigation Trustee has submitted the direct testimony affidavit[1] of Barry Kasoff, a Certified Turnaround Professional and Certified Public Accountant, who studied the Debtor's affairs, including, inter alia, the insiders' activities. In his direct affidavit, Mr. Kasoff has described his perceptions of the defendants' acts and, in more than a few instances, his subjective views with respect to those acts, based on a combination of his review of the acts and his training and experience in business and accounting matters. But he hasn't been offered as an expert under Fed.R.Evid. 702, nor has the plaintiff complied with Fed.R.Civ.P. 26 requirements for expert disclosures.
The defendants move to strike portions of the direct testimony as impermissible lay witness opinion testimony. Their motion is granted in part and denied in part, as described in the accompanying table. My conclusions of Jaw and bases for the exercise of my discretion follow.
Fed.R.Evid. 701(a) provides, in relevant part:
If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or Inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.
As usual, I start with textual analysis. Under Fed.R.Evid. 701, lay opinion testimony is permissible if, but only if, the three subsections of Rule 701(a) are satisfied. I note in that connection, however, that while subsections (a) and (b) are stated affirmatively, subsection (c) is articulated in the negative[2] That means, as a practical matter, that lay opinion testimony is permissible if subsections (a) and (b) are satisfied, and if the testimony isn't then excluded by reason of the effect of subsection (c).
The Second Circuit has twice spoken to this issue, in Bank of Chinn v. NBM LLC, 359 F.3d 171 (2d Cir.2004), and United States v. Rigas, 490 F.3d 208 (2d Cir.2007), in each case involving a fact pattern similar to that here, where an individual conducted *601 an investigation of matters that preceded his arrival on the scene, and then testified about what he found.
In Bank of China, the Circuit held that the admission of lay opinion testimony that was based on a combination of a lay witness's observations and his knowledge of business custom and the business community's understanding of certain kinds of transactions and business concepts was an abuse of discretion. Admission of that testimony was held to be error because it wasn't based entirely on the witness's perceptions. The district court abused its discretion to the extent it admitted the testimony based on the witness's experience and specialized knowledge in international banking. See 359 F.3d at 181.
The Bank of China court explained that "Subsection (c) of Rule 701, which was amended in 2000, explicitly bars the admission of lay opinions that are `based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" Id., quoting Fed.R.Evid. 701(c). Testimony admitted pursuant to Rule 701 must be "rationally based on the perception of the witness." Id., quoting Fed.R.Evid. 701(a).
Thus, to the extent that the testimony was based on the perceptions of the witness, it was admissible, but to the extent that it was based on specialized knowledge, as contrasted to personal observation, it was inadmissible. See id. The Circuit clarified:
To some extent, [the investigating witness] Huang's testimony was based on his perceptions. As a Bank of China employee, Huang was assigned to investigate defendants' activities at the tailend of their scheme and after Bank of China stopped doing business with them. Huang's senior role at the Bank and his years of experience in international banking made him particularly well-suited to undertake such an investigation and was likely a factor in the Bank's decision to assign the task to him. The fact that Huang has specialized knowledge, or that he carried out the investigation because of that knowledge, did not preclude him from testifying pursuant to Rule 701, so long as the testimony was based on the investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking. "Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his [] position in the business."
Id., quoting Fed.R.Evid. 701 advisory committee's note (emphasis added).[3]
Thus, to the extent the investigating witness Huang's testimony was grounded in *602 the investigation he undertook in his role as a Bank of China employee, it was admissible pursuant to Rule 701 of the Federal Rules of Evidence because it was based on his perceptions. But to the extent that the testimony was not based on his perceptions, it was inadmissible.
Similarly, in Rigas, the Circuit affirmed criminal convictions after a trial in which Judge Sand of the district court had permitted the introduction of testimony by Robert DiBella, a forensic accountant retained by Adelphia's new management to examine Adelphia's books and records, and to investigate transactions that had been entered into while Adelphia was operating under the Rigases' watch. Citing Bank of China, the Rigas court found the testimony admissible, as it was based on witness perception, and did not materially involve specialized knowledge with respect to the particular issues on which he was testifying. That was so even though the Second Circuit's decision at least implied (and this Court from its firsthand knowledge knows) that Mr. DiBella's witness perceptioni.e., his ability to observewas materially assisted by his accounting expertise.[4]
Each of Bank of China and Rigas involved circumstances, like those here, where an individual wasn't personally involved in the events that were the principal focus of his testimony, and instead involved the testimony based on participation in an investigation of events that predated the witness's appearance on the scene. Rigas is particularly relevant, because it involved a situation, very similar to the one we have here, where a skilled accounting professional studied what happened before he arrived, and explained in testimony what he had discovered. That was permissible, as reflecting witness perception.
Significantly, however, in neither Bank of China nor Rigas did the Circuit endorse the admission of testimony as to the witness's views as to whether what the witness had perceived was wrongful, or as to what should have been done under the circumstances.
In support of contentions that all of the challenged testimony should be stricken, the defendants cite three other cases, all from outside the Second Circuit. See JGR, Inc. v. Thomasville Furniture Indus., 370 F.3d 519 (6th Cir.2004); DIJO, Inc. v. Hilton Hotels Corp., 351 F.3d 679 (5th Cir.2003); Autoforge, Inc. v. Am. Axle & Mfg., Inc., 2008 WL 65603, 2008 U.S. Dist. LEXIS 755 (W.D.Pa. Jan. 4, 2008). None of these, of course, could trump a Second Circuit decision on point. And in any event, they are nowhere as closely similar to the facts we have here, and to the extent they are relevant at all, they support the nuanced standard articulated by the Second Circuit in Bank of China and Rigas. None involved the testimony of a trained financial professional who had studied financial transactions and reported on what he saw.
Instead, each involved testimony on lost profits and/or the value of a business areas where an outsider's personal perception would often be modest at best, and *603 that traditionally would involve testimony. of bona fide experts, except in cases where the actual owner of the business might have the requisite personal perception. See JGR, 370 F.3d at 524, 526 (CPA and lawyer testifying about lost profits and business value relied on information primarily obtained from plaintiff's principal); DIJO, 351 F.3d at 685 (testifying financial consultant "had little significant actual knowledge about DIJO and its operations;" contrasting ability of "business owners or officers to testify based on particularized knowledge derived from their position") (emphasis in original); Autoforge, 2008 WL 65603, at *6-7, 2008 U.S. Dist. LEXIS 755 at *19-20 (relying on circuit court holdings that "persons outside of a business, including attorneys and financial consultants," who were not able to establish the requisite foundation of personal knowledge, "may not offer a lay opinion as to value or project lost profits of a business") (citing JGR and DIJO).
With those principles in mind, the Court will permit lay opinion testimony that reflects the perceptions of the witness Mr. Kasoff as to what happened (including, inter alia, what the defendants did)even if Mr. Kasoff was aided in forming his perceptions by an ability, aided by his training and experience, to understand what he saw. But to the extent Mr. Kasoff seeks to testify not with respect to his perceptions, but rather with respect to views as to (a) whether what he perceived was right or wrong; (b) what should have been done; (c) what is customary in business practice; or (d) what his training and experience tell him about appropriate conduct in these cases, the testimony will be excluded.
My rulings with respect to the particular aspects of the Kasoff testimony that were the subject of the lay opinion evidence objections appear on the attached Table A to this Decision.
SO ORDERED.

 Table A
 Rulings on Testimony In Issue
¶ # Testimony in Issue Ruling
 9 "Debtor had serious issues relating to its equity and Objection sustained.
 clearly was in the zone of insolvency,"
 20 "Koplik and Siegel knew or should have known by First sentence: objection
 virtue of their positions at the Debtor of the terms of sustained. Second sentence:
 the RCF and the Trade Credit Insurance Policy. objection overruled.
 Siegel was responsible to the Bank for reporting
 about the Debtor's compliance with the various RCF
 covenants, and Michael Kelly, who reported directly
 to Siegel, was responsible for compliance with the
 Trade Credit Insurance Policy."
 21 "Beginning in 1997, the Debtor was experiencing First and third sentences:
 financial difficulty and continued to do so through objection overruled. Second
 2001. As the Debtor's financial situation began to sentence: objection
 deteriorate, it inexplicably took on extraordinary sustained.
 credit risks, in the form of advances, loans and other
 unreasonable trade and non-trade extensions of credit,
 that were disproportionate to its equity position.
 Such problems began to appear after Perry H. Koplik,
 the Debtor's founder, became less involved in the
 management of the Debtor with the defendants taking
 over more active roles."
*604
 22 "In fact, one of the key factors contributing to the Objection overruled.
 Debtor's financial breakdown was the absence of any
 objective decision-making process. Any system of
 internal controls employed by the Debtor was overridden
 routinely by defendants as the key executives
 involved in all key financial aspects of the Debtor.
 Since the Debtor's internal control processes, if any,
 were subject to defendants' override, an environment
 existed that allowed transactions to occur without
 sufficient regard for level of risk, having considerable
 detrimental consequences to the Debtor's business.
 . . .
 I believe that the Debtor did not have, implement or
 utilize any credit policy manuals as a guide to extend
 credit, loans, advances and/or other financial accommodations
 made to third-parties."
 23 "Examples of transactions entered into by the Debtor Objection overruled.
 under defendants' management in the absence of
 any objective decision-making process include: the
 extension of approximately $27 million of total debt
 to ATC which included funding ATC's payroll on an
 emergency basis, the extension of non-trade credit
 that was not supported by proper loan documentation
 and clearly in violation of the RCF, the reduction of
 accounts receivable in exchange for uninspected, and
 possibly nonexistent, inventory, the holding of postdated
 checks, which bounced and were re-deposited
 and bounced again, the extension of additional credit
 to ATC when it was delinquent on existing receivables,
 and the extension of non-trade credit and/or
 investment in International Supply and Agency, Ltd.
 and Samoa Pacific Cellulose, LLC. Thus, despite
 having less than $10 million of equity a part of which
 was illiquid, the Debtor entered into several transactions,
 the majority of which were with ATC, which
 put the Company's viability at severe risk."
 24 "Without a doubt, defendants knew that ATC was First sentence: objection
 experiencing severe liquidity problems. ATC's grave was previously sustained
 liquidity issues were largely the result of its funding for testifying as to another's
 the acquisition of long term assets with short term state of mind, and is
 liabilities." not saved by calling this lay
 opinion. Second sentence:
 objection overruled.
 24 "Despite such knowledge," Objection was previously
 sustained for testifying as
 to another's state of mind,
 and is not saved by calling
 this lay opinion.
 24 "Despite being aware of ATC's financial distress, First sentence portions
 defendants had Debtor advance approximately $27 ("Despite being aware" and
 million to the now bankrupt ATC with knowledge "with knowledge that"):
 that a significant portion of those advances would be objections were previously
 events of default under the RCF and not covered by sustained for testifying as
 the Trade Credit Insurance Policy. To extend an to another's state of mind,
 amount of trade and non-trade credit to one customer, and are not saved by calling
 which amount was three times the Debtor's equity, this lay opinion. First
 and which jeopardized its relationship with the sentence remainder: objection
 Bank, exemplifies the defendants' complete lack of overruled. Second
*605
 credit-risk assessment in connection with the sentence: objection
 Debtor's business operations." sustained.
 25 "These loans violated the terms of the RCF and were Objection overruled.
 not covered by the Trade Credit Insurance Policy;
 thereby endangering the Debtor's working capital.:'
 27 "despite ATC's delinquent and/or nonexistent payments Objection overruled.
 to the Debtor." The Debtor essentially served
 as a financier for ATC, providing millions of dollars
 of financing for ATC's production without any guarantee
 of payment by Kimberly Clark who only
 agreed to the arrangement for the month of March,
 2001."
 28 "Defendants heedlessly exposed the Debtor to unwarranted Objection to "heedlessly"
 risk by continuing to finance production and "As defendants should
 after the end, of March and by depending upon ATC's have expected" sustained.
 relationship with Kimberly Clark to support the invoices. Remainder of quoted testi"mony:
 As defendants should have expected, ATC objection overruled.
 bounced checks that it issued to Kimberly Clark for
 the pulp purchases, resulting in Kimberly Clark's
 offsetting its pulp receivables against tissue payables
 owed to ATC."
 30 "Defendants provided ATC with the foregoing financing Objection to "in complete
 in complete disregard that such actions with ATC disregard," "were well
 and Kimberly Clark violated the RCF and were not aware," and "ignoring these
 covered under the Trade Credit Insurance Policy. red flags" sustained.
 Given the bounced checks and the continued requests Remainder of quoted
 for advances, defendants by March of 2001 were well testimony: objection
 aware of ATC's fiscal crisis. Yet, ignoring these red overruled.
 flags, the Debtor continued to extend trade and nontrade
 credit to ATC."
 31 "[the Ponderosa advance constituted an event of default Objection overruled.
 under the RCF,] endangering the Debtor's
 entire business operations."
 32 "The Ponderosa advance was made in the absence of Objection to "knowingly"
 any objective decision making process on the part of sustained. Remainder of
 defendants for the following reasons: (a) defendants quoted testimony: objection
 knowingly engaged in the transaction without the overruled.
 benefit of appropriate loan documentation; (b) defendants
 extended to ATC an amount equal to approximately
 one-quarter of its equity at a time when ATC
 was long overdue on receivables; (c) defendants'
 actions violated Bank covenants causing a breach
 under the RCF, putting its working capital and the
 Debtor as a going-concern at risk; and (d) defendants
 did not seek advice from, or discuss with,
 Debtor's counsel or accountants the consequences of
 such actions."
 36 "Since ATC had ongoing cash-flow difficulties and Objection to "defendants
 defendants knew that the Debtor needed to keep knew" sustained. Remainder
 ATC's trade accounts receivable balance below the of quoted testimony:
 $15 million limit of the Trade Credit Insurance Policy, objection overruled.
 defendants negotiated an arrangement to reduce
 ATC's accounts receivable in exchange for approximately
 $3,776,941 of inventory of finished goods from
 Ampad, an ATC affiliate."
 37 "It is my belief that this arrangement was, in fact, an Objection sustained.
 illusory transaction, designed to keep the receivables
*606
 below the Trade Credit Insurance Policy's limit. The
 use of the Ampad inventory to reduce ATC's accounts
 receivable balances is another example of
 defendants embarking on a transaction without any
 aforethought or regard for risk."
 38 "Defendants improperly characterized APP's accounts First sentence: objection
 receivable as eligible in the Debtor's borrowing sustained. Second sentence
 base certificates for August and September of and third sentence
 2001. The Debtor continued to extend credit to ATC fragment: objection overruled.
 despite the latter's clearly demonstrated inability to
 pay and questionable viability.
 . . .
 endangering the Debtor's own existence."
 42 "Each of these unpaid, non-trade extensions of credit Objection overruled.
 in its own right constitutes an event of default under
 the RCF."
 43 "In short, defendants caused the Debtor to engage in First and third sentences:
 numerous high risk transactions by extending objection overruled. Second
 approximately $8.5 million of non-trade credit to ATC sentence: objection
 for the latter's purchase or funding of various under sustained.
 performing mills without the benefit of obtaining any
 supporting loan documentation or consulting with
 Debtor's attorneys. If known by the Bank, such
 breaches of the RCF would have resulted in the
 acceleration or refinancing of the loan or the restructuring
 and/or liquidation of the Debtor's business.
 Thus, each and every non-trade extension of credit
 put the Debtor's working capital and, consequently,
 the Debtor's viability at risk."
 44 "No reasonable person would believe that putting the First sentence: objection
 Debtor's business at risk was worth the unlikely sustained. Second sentence,
 benefit of transacting business with ATC. Indeed, it portion stating "and,
 is questionable whether defendants conducted any to the best of my knowledge,
 type of assessment of the high risks associated with no document exists
 the non-trade credit transactions with ATC, and, to evidencing such assessment
 the best of my knowledge, no document exists evidencing or analysis": objection
 such assessment or analysis." overruled. Remainder of
 sentence: objection
 sustained.
 45 "Likewise, defendants' reliance on ATC's proposed Third sentence: objection
 bond offering was given without the benefit of any sustained. Remainder of
 objective decision-making process or advice from testimony in this paragraph:
 professionals. Defendants did not analyze the financial
 statements supporting the bond issue. Instead, defendants
 somehow claim to `have relied upon the
 prospectus and alleged due diligence conducted by
 UBS Warburg, despite knowing that ATC's true
 financial condition was not accurately depicted therein,
 in part, because defendants-failed to disclose the
 extraordinary loan transactions outlined above. The
 Debtor's history shows that, after ATC's prior bond
 offering in 1999, the Debtor's business with ATC
 declined even though ATC had the cash flow to
 engage in such business."
 46 "As the years progressed and the Debtor's financial Second sentence: objection
 condition deteriorated, it became increasingly more sustained. Remainder of
 reliant on ATC as a customer. Defendants' reliance, testimony in this paragraph:
*607
 however, was disproportionate with the actual objection overruled.
 amount of revenue produced by ATC; In 1998-1999,
 the revenue generated by sales td ATC represented
 approximately 13%-14% of the total revenue of the
 Debtor. However, in 2000, theremenue generated by
 sales to ATC dropped to approximately 7% of the
 Debtor's total revenue, and, while sales to ATC
 picked up in 2001, to equal approximately 10% of the
 Debtor's total revenue, those sales were a function of
 ATC's difficulty in obtaining credit from other companies.
 Moreover, the Debtor, was not receiving the
 cash generated from those sales in 2001 since almost
 all of the sales in 2001 to ATC were on credit. The
 Debtor sold approximately $28 million to ATC in
 2001 but collected only a few million dollars for the
 sales on a net basis during that same time period."
 48 "The Debtor unnecessarily continued to enter into First and second sentences:
 high risk transactions and to extend unjustifiable objection sustained.
 amounts of credit to ATC despite defendants' knowledge Remainder of quoted language
 of ATC's such illiquidity was clearly in this paragraph:
 evident by February of 2001, objection overruled.
 . . .
 The Debtor's receivables from ATC were not being
 paid in a timely manner. Days-sales-outstanding skyrocketed
 to 120 days in February of 2001 and were
 not paid in cash. The Debtor chose to re-age or
 extend the credit terms to ATC on those receivables
 from 30 days to 60 days and then to 90 days all in
 violation of the Trade Insurance Credit Policy. By
 April, ATC could not even cover its own checks and
 bounced approximately $4 million in checks to the
 Debtor between May and June of 2001."
 49 "In short, the Debtor was extending credit beyond First and second sentences:
 that which a reasonable business person would extend objection sustained. Third
 under terms that no reasonable business person sentence: objection overruled.
 would have extended to ATC. To extend such an
 extraordinary amount of trade and non-trade credit
 to a customer while jeopardizing its banking relationship
 is not prudent business.
 . . .
 As a result, Koplik, without the, benefit of any objective
 analysis, outside legal or accounting advice, or
 Board of Directors' input, extended additional credit
 to ATC for trade and non-trade transactions until
 ATC's bond offering could theoretically be
 completed."
 50 "In addition to the extraordinary transactions Objection overruled.
 entered into with ATC,"
 55 "The transaction with Samoa both violated the RCF Objection overruled.
 and generated a significant loss to the Debtor.
 Again, no legal advice was sought in connection with
 the alleged loans, and, consequently, no rational
 decision-making process was employed."
 58 "Somewhat suspiciously, only after RST questioned First sentence: objection
 the loan, sustained. Second and
 . . . third sentences: objection
 The memo written by Siegel is inconsistent with the overruled. Fourth sentence:
 Debtor's audited financial statements for the years objection to portion
*608
 1996 through 2000, for which Siegel was responsible, "It is my belief that such
 since such documents show the loan as an asset salary was excessive"
 without any offsetting liability. Notably, this loan Sustained, but objection
 was in addition to the base salary paid to Siegel in to remainder overruled.
 the amount of $300,000. It is my belief that such
 salary was excessive given that the majority of Siegel's
 services were performed from his home in Florida
 away from the Debtor's actual daily business
 operations."
 59 "To the best of my knowledge and given the exorbitant Objection sustained.
 salaries already received by defendants, the
 Debtor did not receive fair consideration and/or
 reasonably equivalent value in exchange for the
 Transfers."
 61 "The Debtor violated the RCF and/or entered into Objection overruled.
 transactions not covered by the Trade Credit Insurance
 Policy by, among other things, funding ATC's
 various acquisitions of mills such as the Ponderosa,
 Keiffer Paper and Shelby mills, funding the production
 of goods for sale to Kimberly Clark, extending
 certain working capital loans to ATC, providing
 loans, advances and/or excessive compensation to the
 Debtor's officers and employees and their relatives,
 advancing funds with respect to Willendra and his
 company and Samoa, borrowing against ineligible
 accounts receivable and improperly applying payments
 to reduce ATC's accounts receivable rather
 than APP's accounts receivable."
 66 "Since each of these transactions, in and of itself, Objection overruled.
 violated the RCF and constituted events of default
 thereunder, the Bank was entitled to accelerate the
 indebtedness of the Debtor due under the RCF.
 Accordingly, the Debtor essentially was rendered"
 insolvent upon its first unauthorized transaction with
 ATC. Simply put, without the ability to access funding
 or working capital, the Debtor could not meet its
 obligations to others."
 67 "Moreover, it was completely irrational for the First sentence: objection
 defendants to believe that the Debtor could recover sustained with respect to
 under the Trade Credit Insurance Policy, when, in "it was completely irrational
 violation of such policy, the Debtor allowed the for the defendants to believe
 days-sales-outstanding to get inordinately high and that the Debtor could
 then reached an agreement, without the insurance recover under the Trade
 carrier's knowledge or consent, with ATC to re-age its Credit Insurance policy,"
 receivables from 30 to 60 to 90 days. The Debtor also and overruled with respect
 accepted payment for such receivables in inventory to "in violation of such policy,
 without even inspecting the same solely for the purpose the Debtor allowed the
 of reducing the ATC receivables to within the days-sales-outstanding to
 policy's limits and improperly reduced ATC's receivables get inordinately high and
 instead of those belonging to the true party in then reached an agreement,
 interest." without the insurance
 carrier's knowledge or
 consent, with ATC to reage
 its receivables from 30
 to 60 to 90 days." Second
 sentence: objection overruled.
*609
 68 "In addition, the Debtor withheld information Objection sustained.
 regarding ATC's true financial condition. ATC's
 bounced checks, its inability to fund its own payroll,
 and its wholesale dependence on ATC's bond offering
 are huge red flags which should have put the defendants
 on notice to take stepsto limit its exposure to
 ATC in a proper fashion. The Trade Credit Insurance
 Policy is not a guaranty for any loss irrespective
 of defendants' actions. When defendants became
 aware of these red flags, they had an obligation to
 take steps to reduce the Debtor's exposure to ATC
 or run the risk that the insurance company would not
 cover such obligations. Defendants illogically chose
 to accept that risk. Under these circumstances, no
 rational person would believe that the Trade Credit
 Insurance Policy would cover the extraordinary
 amount of credit extended to ATC, and defendants'
 reliance on the same as a safety net is completely
 unjustifiable."
 68 n. 1 "Similarly, defendants clearly could not rely on the Portion "defendants neither
 guarantees issued by Mehdi Gabayzadeh, former evaluated the creditworthiness
 CEO of ATC, and Super American Tissue, an ATC of the guarantors and
 affiliate, to recover the sums owed by ATC since their respective assets nor
 defendants neither evaluated the credit worthiness of requested any security with
 the guarantors and their respective assets nor requested respect to same": objection
 any security with respect to the same." overruled. Remainder of
 quoted sentence: objection
 sustained.
 69 "Over the course of those three days, RSI reviewed Objection overruled.
 the Debtor's assets, liabilities, and equity and concluded
 by October 28, 2001, that the Debtor was in
 the zone of insolvency"
 70 "Based on this further analysis, it grew clear that the Objection overruled.
 Debtor became insolvent between March and June, of
 2001.
 . . .
 Moreover, the Debtor clearly was in violation of the
 RCF at that time and, without the ability to have
 funding from the Bank, would have no working
 capital, rendering it insolvent."

NOTES
[1] Under the Court's case management order, direct testimony in the trial has been submitted by affidavit, with cross-examination and subsequent testimony to proceed live.
[2] Rule 701 was amended in 2000, at which time the original language was divided by the lettered subdivisions that now appear in the Rule, and the material that is now in subdivision (c) was added. See Mueller and Kirkpatrick, Federal Evidence, § 7:1 (2007). Thus it now explicitly bars the admission of lay opinions that are "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701(c).
[3] I'm aware that the Bank of China court stated that testimony involving personal perception with the benefit of professional expertise was permissible so long as it wasn't "rooted exclusively" in the witness's professional expertise (there, in international banking). That could be read as suggesting that a peppercorn of personal perception would permit a great deal of lay opinion testimony, circumventing the safeguards of Fed.R.Evid. 702 and Fed.R.Civ.P. 26. I think it is truer to the language and spirit of Bank of China to try to separate the testimony based on perception from that based on opinion on an answer-by-answer basis (and individually within each answer, to the extent necessary), and in the exercise of my discretion, I will be permitting testimony only to the extent that any aspect of a larger body of testimony embodies, in material part, witness perception. See Bank of China, 359 F.3d at 181 (noting purpose of Rule 701(c) "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing").
[4] My understanding of the Second Circuit's ruling in Rigas is assisted by my personal knowledge, as a consequence of Adelphia's bankruptcy case having been before me, and matters as to which I can take judicial notice. I know that Mr. DiBella had accounting expertise, because I heard testimony by Mr. DiBella, on distinct, but related, issues, Myself. But Mr. DiBella's testimony in the criminal case was in material respects based on what he observed, and did not go to issues where his accounting expertise, other than his ability to explain what he saw, was material to the issues on which he was testifying. Mr. DiBella testified on matters invoking his accounting expertise to a considerably greater degree in the Adelphia bankruptcy case, without objection by any party.